**Edward KOWAL**

v.

**The UNITED STATES.**

**No. 1-68.**

United States Court of Claims.

July 16, 1969.

---

Robert Dyer, Orlando, Fla., attorney of record, for plaintiff; Van Den Berg, Gay, Burke & Dyer, Orlando, Fla., of counsel.

Ann Bowen, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

DAVIS, Judge.

Before December 1963, plaintiff Edward Kowal was a civilian employee (Plans Officer) at Patrick Air Force Base in Florida. He also owned and, with the help of his wife, operated a small fleet of cabs and a small bus company. Not only was he an ardent public advocate of increased government-supported public transportation in the Patrick Air Force Base–Cape Kennedy area, but in 1962 he held a short contract with the Air Force for transporting local school children. In early 1963 he learned that the Air Force was contemplating a shuttle service between the base and the cape, and he submitted a bid on behalf of his firm, Brevard Transit Company. He was the low bidder, but the award was stalled because he was a government employee. To avoid potential conflicts of interest, government policy and regulations discouraged the letting of contracts to employees.

Upon learning of this impediment (or beforehand, according to some testimony) Kowal approached his mechanic-bus driver, Charles Wood, with the suggestion that the latter "buy" the bus company, or at least have the stock transferred to his name. Charles Wood concurred and some agreement was reached. Mr. Wood then took over the dealings with the Government, signing the proposed contract as president of the Brevard Transit Company. No written contract of sale by Kowal to Wood was ever executed, no stock issued to Wood (or his brother and wife who were also to be the new shareholders), and no papers or records of the company transferred.[1]

Because of doubts whether plaintiff had separated himself from Brevard Transit, the Air Force's contracting officer required of Charles Wood that two affidavits be executed, one from the company listing its current owners and certifying that no government employees had an interest in it, the other from Kowal that he had sold the company and no longer retained any ownership, interest, or employment. On April 20, 1963, Charles Wood and Kowal went to the office of Kowal's attorney who dictated the required affidavits and had them prepared by his secretary. Kowal and Wood signed them, Wood delivered them to the Air Force, and the government contract was consummated, the bus service beginning a few days later. This contract lasted for only two and a half months (i. e. until the end of the fiscal year, as scheduled), and Brevard failed to receive the continuation business. When

---

1. According to testimony of Kowal and the Woods at Kowal's criminal trial, the agreement provided for the transfer to the Woods of only the corporate stock, charter, and certificate of public convenience. Plaintiff was to retain the buses themselves, leasing them to the corporation on a per mile basis. There was no purchase price passing from the Woods to Kowal.

the government service was thus terminated, Kowal once again assumed control and ownership of the company.

During the summer of 1963 the Federal Bureau of Investigation and the Office of Special Investigation (OSI, a military counterpart of the FBI) investigated Kowal's activities, interviewing Wood and his brother William (who had been certified to the Government as an owner of Brevard Transit). The brothers gave affidavits which tended to show that the purported transfer of the company was a sham, done for the sole purpose of obtaining the government bus-service contract, and that return of the control to Kowal was always contemplated. On November 7, 1963, Kowal was arrested for violating 18 U.S.C. § 1001 (1964), in that he "knowingly and willfully made a false and fictitious statement and representation of a material fact" by stating in his affidavit to the Air Force that he had sold the company.

The next day removal proceedings were begun against him, arising from the same incident. The letter of proposed removal charged him with "Deliberate misrepresentation, fraud, falsification, and concealment of a material fact for your own personal gain," also referring to the affidavit he had made on April 20th.[2] Kowal replied, stating his ignorance of a set policy against letting contracts to government employees, and his actual sale of the company to the Woods. He was removed from employment on December 20, 1963, and appealed to the Regional Office of the Civil Service Commission. That body affirmed the separation, but without seeing the affidavits of the Wood brothers, which were withheld by the Air Force pending Kowal's criminal trial. (There was no live testimony before the Regional Office.)

Decision on appeal to the Civil Service Commission's Board of Appeals and Review was postponed until after that trial. It lasted three days in March 1965, and during it the brothers Wood, Kowal, and the latter's attorney testified as to the nature of the transfer of the company by Kowal to the Woods. In their testimony the Wood brothers gave an entirely different impression, from that implicit in their earlier affidavits, as to the *bona fides* of the transaction and Kowal's belief that a real transfer had taken place. In effect their testimony vindicated plaintiff. The Government did not use the earlier affidavits to impeach this new and different view of the facts, nor did it inquire about some of the damaging incidents described in the affidavits. The jury, after an hour's deliberation, found Kowal not guilty.

The Board of Appeals and Review was then provided a transcript of the testimony at the criminal trial and copies of the Woods' prior affidavits (as given to the FBI), together with additional arguments from Kowal's counsel and the Air Force based upon this new evidence. No oral testimony was taken or ordered by the Board. In September 1965, the Board affirmed the Regional Office, sustaining removal. The appellate opinion emphasized the separateness of the criminal and the removal actions and that "the disposition of the criminal proceeding does not determine the propriety of the removal action." The opinion concluded that "[u]pon review of all the evidence, including the affidavits from Mr. Charles P. Wood and Mr. William B. Wood, and giving due consideration to the court's verdict, the Board finds * * * that the preponderance of the evidence supports the charge." This court action was then begun, both parties

---

2. The proposed removal, and the subsequent removal decision, were based alternatively on a charge of wrongful use of privileged information, in the disclosure of certain figures in Kowal's testimony on behalf of Brevard Transit Company before a Senate subcommittee in Washington on March 4,

1963. This charge was invalidated by the Regional Office of the Civil Service Commission as not being sufficiently specified in the letter of proposed removal, and has dropped out of the case, except insofar as plaintiff relies on it to show the Air Force's true motivation in removing him.

seeking summary judgment on the record before the Civil Service Commission.[3]

■■■ The Board was clearly correct that the decision in the criminal case was not binding upon it as *res judicata*.[4] While the parties to the criminal and the removal proceedings were the same, the charges, though parallel, were not precisely on all fours and the burden of proof was different—a preponderance (or, perhaps, clear and convincing evidence) in the removal proceeding, beyond a reasonable doubt in the criminal. Since only a general verdict was rendered, there is no absolute certainty as to how the jury decided specific issues of fact, and collateral estoppel in the strict sense is therefore not warranted either.

■■■ Nevertheless, the complete transcript of the criminal trial was before the Board and it was required to consider the testimony of the witnesses as evidence in the removal case, giving it due weight consistent with its reliability. Without doubt, the criminal transcript was directly relevant to the removal proceeding. The heart of each case was Kowal's good faith belief that a transfer had occurred, and the witnesses at the trial spoke precisely to that point. From the administrative decision and the record, it appears to us that the Board failed to accord proper weight to the trial testimony, and therefore that the discharge was wrongful in that it was arbitrary or not supported by substantial evidence on the record as a whole.

It is possible that the Board did not consider the actual trial testimony at all, for its opinion recites only that it paid attention to the "court's verdict." [5] If this were so, then the decision would fall on this ground, for in refusing to consider all the evidence the Board would have acted arbitrarily. Hemby v. United States, 185 Ct.Cl. 140 (1968). However, it is also conceivable that the Board read the transcript, and the testimony of the Wood brothers, and decided to give credence to the affidavits given to the FBI, rather than to the oral testimony. If so, its determination must be tested by the substantial-evidence standard.

■■■ Court review of an administrative decision for substantial evidence must concern itself with the "record as a whole"—not only with the mere existence of some evidence at some point in the record, but with the sort and type of that evidence, its credibility and trustworthiness, its relationship to the other evidence, and the amount, type, and credibility of the other evidence. *See, e. g.,* Koppers Co. v. United States, 405 F.2d 554, 557–559, 186 Ct.Cl. 142 (Dec.1968).

3. We reject the Government's contention that plaintiff's delay of 27 months from the Board decision to the filing of suit in this court constitutes laches. The period itself is not overly long, is in large part explained by plaintiff's appeal to the Civil Service Commissioners under their Rule 772, and his search for an attorney versed in government personnel matters to whom he did not owe money, during which time he continued his active protest of his removal. Nor does the Government present any basis for a finding of special prejudice arising from this delay. No recent case in this court upholds laches when the period was as short as this.

4. *See* Cohen v. United States, 369 F.2d 976, 177 Ct.Cl. 599 (1966), cert. denied, 387 U.S. 917 (1967), 87 S.Ct. 2029, 18 L.Ed. 2d 969; Prater v. United States, 172 Ct. Cl. 608, 613 (1965); Cook v. United States, 164 Ct.Cl. 438, 445 (1964); Finn v. United States, 152 Ct.Cl. 1, 5–7 (1961);

Bryant v. United States, 122 Ct.Cl. 460, 466–467 (1952), cert. denied, 344 U.S. 913, 73 S.Ct. 335, 97 L.Ed. 704 (1953); Croghan v. United States, 89 F.Supp. 1002, 1004, 116 Ct.Cl. 577, 586, cert. denied, 340 U.S. 854, 71 S.Ct. 71, 95 L.Ed. 626 (1950).

5. This was said after the Board indicated its agreement with the employing agency that "the removal action * * * is completely separate and apart from any subsequent criminal proceeding and that the disposition of the criminal proceeding does not determine the propriety of the removal action. It is significant in this respect to recognize that administrative reviewing bodies are not bound by the strict rules of evidence or strict application of legal principles". Some might infer from these remarks, taken together with the reference to the "court's *verdict*", that the Board did not consider the trial *testimony* pertinent to its inquiry.

The record before the Board of Appeals and Review contained two contradictory versions of the facts—the affidavits of the Wood brothers, and their subsequent testimony at the criminal trial. In some circumstances the Board might well be free to believe either statement; in the particular circumstances, however, we conclude that it could not choose to believe the affidavits rather than the oral testimony.

The magnitude of the discrepancies between the affidavits and the oral testimony emerges from the following summary of the affidavits (putting the trial testimony in brackets): Charles Wood implied in his affidavit that the transfer of stock was a subterfuge to circumvent the procurement regulations. [At trial, it appeared that the procurement restrictions were a motivating factor, but that all participants considered their plan to be a legal way of avoiding them.] Stock was to be transferred to the Woods, but stock control was in fact to remain in the Kowals. [*All* the stock was to be transfered to the Woods.] All ownership and control were to be returned to the Kowals after the government contract was completed. [The original contemplation was for absolute transfer, on a permanent basis. The return to Kowal resulted from the financial collapse of the Woods, and their indebtedness to Kowal, on whose loans the company had depended.] Even after the agreement, Kowal still made the big decisions. [All management and operating decisions were made by the Woods, with Mrs. Kowal only keeping the books and writing the payroll.] Kowal did all the hiring and firing during the period of supposed transfer. [The Woods were in charge of personnel.] Kowal provided the figures to be used in bidding on the continuation contract. [Charles Wood prepared the bid himself, as well as a prior one.] Kowal wrote the protest letter following the award of the continuation contract to another firm. [Not mentioned at the trial.] William Wood stated in his affidavit that only management, not ownership, was turned over by Kowal. [At tri-al, everyone testified that they thought ownership had been transferred, even if later consideration of legal technicalities showed that it had not in fact occurred.] Other bus operations were still managed by Kowal, and receipts turned over to him. [Not mentioned at the trial.] Kowal handled the news release and picture which publicized the change in ownership of the Brevard Transit Company from Kowal to the Woods. [The Woods bragged about their position as owners and officers.] There was never any intention to have the Woods buy and Kowal sell any part of the bus company. [The parties intended just that, but the legal proprieties were never attended to because of lost records.]

It is plain from this survey that, if the Woods' trial evidence is credited, there is no ground for finding plaintiff guilty of the charge on which he was removed. His *bona fides* would be satisfactorily proved. It is otherwise, of course, if the Woods' prior affidavits are credited instead. There are several reasons why, in our view, the Board did not have the free choice to select the latter over the former.

The Board had no special advantage, we note at once, in appraising credibility. The Woods' oral testimony was not taken by the Board, the Regional Office, or any hearing officer of the Civil Service Commission, who could then properly base a decision on credibility or intangible factors such as appearance and demeanor on the witness stand. That testimony came in the tangible form of a 225-page written transcript entirely made in another tribunal. On this score the affidavits and oral testimony stood before the Board on an even basis—the value of neither could be enhanced or reduced by intangible considerations known to the Board (or its agents) though not appearing, or able to appear, in the record.

On the other hand, the circumstances under which the contradictory statements were elicited were markedly dissimilar, and that difference is most significant to any comparative evaluation. The brothers' affidavits were actually

drawn up by the investigating FBI agents; the composition was primarily the agents'. The statements, although sworn to, were the result of questioning by the Government alone, in an atmosphere of possible culpability on the part of the Woods as well as Kowal.[6] There was, of course, no participation by plaintiff or his attorney, and no counsel for the Woods. In contrast, the testimony at the trial was also given under oath, but in the witnesses' own words, *verbatim*. The atmosphere was adversary, cross-examination was available and used. There was opportunity for a detailed examination of the Woods' story. Naturally, attorneys were present for both sides. We have recently emphasized the inherent superiority of testimony subject to cross-examination to that given in an *ex parte* situation. See Hemby v. United States, *supra*, 185 Ct.Cl. at 148; J. D. Hedin Constr. Co. v. United States, 408 F.2d 424, 427–428, 430–431 & n. 12, 187 Ct.Cl. ——, (March 1969).

Apart from the nature of the evidence itself, there are two additional considerations which cannot help but reflect upon the relative reliabilty and credibility of the two versions. First, the jury must have believed the testimony the Woods gave at the trial, or at least its core. While we do not know the actual arguments of counsel (which were not made part of the transcript before the Board), we must conclude from the general tenor of the trial and the instructions of the court, that the credibility of the Woods and Kowal was very much at issue—both as to the existence of an oral agreement and as to Kowal's good faith belief in such an agreement—and the jury decided in their favor. The jury must have believed that Kowal acted in good faith (or, at least, that he was not shown to have acted in bad faith) or they could not have acquitted.

Second, the prosecuting attorney had the Woods' affidavits in his possession at the time of the trial, but chose not to rely upon them for cross-examination (or in any other way). A number of the details of the pre-trial statements were made the subject of inquiries of the Woods, Kowal and Kowal's attorney; others were passed over and ignored. In no instance were the afidavits used to refresh the witnesses' recollection or to contradict them. We do not know the reasons for this prosecutorial forbearance, but we must take account of the resulting fact that the Woods were never confronted with the statements in their affidavits, and never asked directly to reaffirm, deny, or explain them, or given that opportunity (except as may have occurred indirectly through their oral examination). The upshot is that their oral testimony was subjected to considerable testing in the normal way, while their written affidavits remained unprobed—and to the extent the affidavits were actually tested in oblique fashion their adverse parts were in effect repudiated.

In sum, the Board was faced with detailed oral testimony given at the criminal trial and prior inconsistent statements of the Woods, the prior affidavits withheld by the prosecutor at trial, the oral testimony apparently believed by the jury, and the contents of the affidavits in effect repudiated. Neither the Board nor its agents had any advantage in determining credibility but had to rely entirely on the written record. In these circumstances we conclude that the Board could not rationally choose to believe the affidavits over the oral testimony, unless the latter was inherently incredible. *See* J. D. Hedin Constr. Co. v. United States, *supra*. We do not find the transcript testimony to fall at all within this category (and the Board did not say that it was incredible). The Woods and Kowal were not experienced businessmen, but only small entrepreneurs. They could easily have believed that the planned

6. The trial testimony indicates that, according to the Woods, the fact of FBI investigation of the transaction colored the Woods' feelings about it at that time, causing them first to doubt its legal effectiveness and then to question the motivations behind it.

arrangement would divest Kowal of ownership within the contemplation of the law. In fact, the criminal trial judge felt there was sufficient evidence to instruct the jury on the requisites of a legally binding oral contract of sale. There is a great deal of more or less tangible evidence in the trial transcript of actual intent to transfer the bus company stock and the parties' good faith belief that they had done so on the date of the affidavit given to the Air Force by Kowal.[7] We must therefore reject the conclusion of the Board, resting in largest part on the affidavits of the Wood brothers, as unsupported by substantial evidence in the record as a whole.[8]

This ruling saddles the Commission with no great handicap. Under its rules the Board of Appeals and Review has discretionary power to hold its own hearing on any disputed matter, on the basis of which it can make an independent decision on credibility. 5 C.F.R. § 772.-307(b) (Jan. 1, 1968). In this case such a hearing could have been ordered; the differing versions given by the Wood brothers in their affidavits and at the trial could then have been submitted to inquiry and cross-examination, and the facts determined by the Commission itself on the basis of the testimony before it.[9]

The Board articulates no ground other than the Wood affidavits for upholding the removal action, and we shall not search the record to find some other basis upon which the Board could possibly have relied had it chosen to do so. It is not unreasonable to demand of the Commission that it specify the reasons for its conclusions, and that it indicate the testimony or evidence on which it rests. See Beckham v. United States, 392 F.2d 619, 622–623, 183 Ct.Cl. 628, 636 (1968); Loral Electronics Corp. v. United States, 387 F.2d 975, 980, 181 Ct. Cl. 822, 832 (1967); Smith v. United States, 168 Ct.Cl. 545, 553 (1964). A lesser requirement would undermine the substantial evidence standard, which proceeds on the assumption of a decision on an issue by the administrative body, subject to limited review by the courts. If an administrative conclusion is affirmed because of the existence of evidence which might support a ground not set forth, a court runs the danger of up-

---

7. There was substantial agreement among the witnesses as to the broad outlines of the deal. The attorney (Hoseman) testified that he was informed that there had been a sale, that he and Kowal had talked previously of a sale, and that he could not draw up papers because of missing corporate records. Kowal went to some effort to reassemble the corporate documents during this period. Unchallenged testimony established that the Woods actually managed the bus company after the turnover—scheduling drivers and runs, getting the buses repaired, inspected, and insured, filling out a request for information on government contracts, and submitting two bids. A number of documents—a stock certificate endorsed in blank, an unsigned conditional sale agreement, and a form for lease of the buses from Kowal by the company—were delivered to Hoseman's office. The local paper publicized the transfer. The suspect affidavit of April 20th was drawn up by Kowal's attorney, and signed in his office, which could easily make it appear additionally bona fide and legal in the eyes of Kowal and the Woods.

8. As indicated supra, almost every damaging allegation of the affidavits was contradicted at the trial. Those few upon which there was no comment must be treated as if they were gainsaid too, for the prosecutor was aware of them and chose not to bring them to light when it was quite possible they could have been explained.

9. Perhaps unnecessarily, we point out that we are not holding that the Commission must always credit trial-type testimony over affidavits. Our decision here is rested on the circumstances of this case, especially the facts that the same witnesses' statements were involved in both the affidavits and the trial evidence, that the two versions were in direct conflict, that the affidavits were never subjected to any scrutiny at all comparable to that given the trial testimony, and that the Commission had no special advantage in judging credibility while the criminal-trial jury did.

holding a decision never in fact made. The parties would be deprived of a weighing of the preponderance of the evidence on that issue during the administrative process.[10] Since in this instance the only pieces of evidence mentioned by the Board are the affidavits of the Wood brothers, we are justified in believing that those statements predominantly affected the decision. This was fundamental error, vitiating the discharge. Plaintiff is entitled to recover, his motion for summary judgment is granted and defendant's is denied. The amount of the judgment will be determined under Rule 47(c).

10. We need not decide in this case whether a standard higher than "preponderance of the evidence" applies to charges involving fraud against the Government, bad faith or falsity in making statements to the Government, etc. *Cf.* Urbina v. United States, 180 Ct.Cl. 194, 213–214 (1967).