**William F. REIL**

v.

**The UNITED STATES.**

No. 80–71.

United States Court of Claims.
March 17, 1972.

---

Edwin J. McDermott, Philadelphia, Pa., attorney of record for plaintiff.

Steven Bercik, Elizabeth, N. J., with whom was Asst. Atty. Gen., L. Patrick Gray, III, for defendant; Thomas W. Petersen, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, COLLINS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

William F. Reil sues in this court under 28 U.S.C. § 1491 to recover back pay. A veteran's preference eligible, and classified civil service employee, he served for many years at the Philadelphia Naval Shipyard as a Production Dispatcher. June 3, 1968, he received a letter telling him he was to be removed for "Conduct Unbecoming a Government Employee." This took effect on July 31, 1968. The Department entertained his appeal but after a hearing upheld the action taken. The Philadelphia Region, Civil Service Commission, held on appeal to it, that one specification was not sustainable, and removal on the other one only was unreasonably harsh. However, the Board of Appeals and Review, CSC (hereinafter BAR) sustained both charges upon a Government appeal. It is not in dispute that plaintiff exhausted his administrative remedies and was sufficiently prompt in bringing this suit.

The case is before us on cross-motions for summary judgment. We have before us the administrative record and other documentary material plaintiff submits here, but we find it unnecessary to consider the latter, because the administrative record suffices, as we will show, to sustain plaintiff's position. His removal was not supported by substantial evidence.

The initial charging letter followed the charge of Conduct Unbecoming a Government Employee with two specifications, as follows:

Specification 2a, said that a fellow employee, Peter F. Byrne, had stated to the FBI that from December 1966 to March 1967 he had placed about three horse bets a week with plaintiff and collected from plaintiff the payoffs on winning bets, all in a Shipyard building.

Specification 2b, said that another fellow employee, Robert A. Bell, had stated to the FBI he had learned that plaintiff was a person he could place numbers bets with, and he had placed one, amounting to $.05 or $.10, in a Shipyard building.

There is some confusion in the record what to call the offense plaintiff was charged with. However, the BAR in its decision says the offense was "promotion of gambling" and we accept that as authoritative. The plaintiff does not here attack the charges as insufficiently specific, so we need not consider that issue. The Navy's *Standard Schedule of Disciplinary Offenses and Penalties For Civilian Employes in the Naval Establishment*, which was hung on a bulletin board in the shop, listed "Promotion of Gambling on Navy premises" as an offense, punishable, for a first offense, by reprimand as a minimum, removal as a maximum. "Gambling or unlawful betting on Navy premises" was listed separately, and punishable, for a first offense, by a reprimand as a minimum, 10 days suspension as a maximum. The record does not directly explain why activity accessory to gambling was to be dealt with more severely than gambling itself. In the absence of a better explanation, we suppose the framers of the Schedule viewed "promotion of gambling" as making gambling transactions on behalf of others, such others being

thought to be typically engaged in organized crime. The offender might not be wagering his own money or paying winners out of his own pocket. On the other hand, "gambling" pure and simple might be a personal peccadillo of some but little significance to the management of the Shipyard. The record reflects that such a distinction was in the minds of the participants in the case. Pennsylvania law (18 Purdon's Penna. Statutes Annotated § 4601) made conducting a lottery a crime and 18 U.S.C. § 13 made this law apply within the Naval shipyard. The FBI agent who took the Byrne statement advised Byrne that one who placed a "numbers" bet did not violate Federal or State criminal law but one who was "involved in the operation of a numbers lottery" did.

The Navy management also relied on a Department of Defense directive, subject, *Standards of Conduct* which in paragraph XI provided that "DOD personnel" should not while on Government premises or on duty, participate in any gambling activity, including operating a gambling device, conducting a lottery or pool, or selling or purchasing a number slip or ticket. The Secretary of the Navy called this to the attention of the Naval Shipyard, which re-issued it as a Naval Shipyard Instruction. The Philadelphia Region put it aside because it prescribed no specific penalty, and the BAR did not mention it at all. Thus "promotion of gambling" has no real rival as the name of the offense here involved. After the Navy hearing but before the CSC heard plaintiff's appeal, he had been tried and acquitted in the Federal District Court on charges of "setting up and maintaining an illegal lottery on a federal reservation, bookmaking on a federal reservation." The CSC was aware of this result but had no knowledge of the details of the trial. It did not consider the mere result significant. Plaintiff has filed a transcript of this trial with his motion here, but in view of our conclusions arrived at on other grounds, we deem it not necessary to consider it and do not do so.

We now turn to the evidence at the Navy hearing, to which nothing of significance, other than the acquittal, was later added before the CSC.

As to Specification 2a, the Navy called Byrne, but he declined to answer any question on the ground of possible self-incrimination. It then called Oliver B. Revell, FBI agent, who testified that he took the Byrne statement referred to in that Specification. Over repeated objection on hearsay grounds, he was allowed to read the statement into the record and it was also marked as an exhibit. It asserts that Byrne placed with Reil approximately three horse bets a week, totalling about $15 a week, from December 1966 to March 1967. Byrne also received pay-offs from Reil when due. This usually occurred at the Shipyard, but he occasionally 'phoned Reil at his home or Reil called him, to place bets or inform of winnings. He identified Reil from a photograph. He had been questioned by a Detective Lewis, and two days later Reil 'phoned him to ask what he had said and remarked he was not going to take any bets for a while. Byrne told Reil the police knew who he was.

Markings on the exhibit show it was dictated March 4 (*i. e.*, three days after the interview). Revell was not asked to produce any rough notes he might have taken so it does not appear to what extent he depended on memory in dictating. Byrne did not sign or swear to the statement, nor was it, evidently, submitted to him for correction. Revell was thinking, he testified, only about making a criminal case, and so, no doubt, he did not envision the use the statement was put to. This may account for his omitting all the embellishments lawyers and investigators usually attach to *ex parte* statements, to add to weight and acceptability; Q and A form, affidavit form, having the witness correct the text in his own handwriting, etc. For reasons already given, he did not visualize making any criminal case against Byrne, who merely placed his own bets, and so advised him. He gave Byrne no kind of

warning, *Miranda,* or other, only reassurance.

The Lewis statement, above mentioned, is also in evidence. Lewis was a Shipyard detective. He gave Byrne full *Miranda* warnings and Byrne wrote the statement in his own hand. Byrne wrote he intended to make a bet with a fellow named Willie, in Bldg. 16. He didn't know his last name. He had a "slip" in his pocket and was picked up with the slip in his possession. "I am not a regular bettor but I have bet on occasion." This is dated March 1, 1967, just a year before the other statement. It will be noted, if he didn't know Willie's last name, he could hardly have 'phoned him at home and had the conversation as the other statement represents. There is also a description of Willie in this statement, but there is nothing to compare it with in the record. The trier of fact, however, had Reil before him. Byrne's statement that he was not a regular bettor but had bet on occasion hardly squares with his later representation that he bet with Reil about three times a week.

The Philadelphia Region thought these statements in hopeless conflict. The BAR thought the differences relatively minor and that both statements showed that Byrne placed horse bets.

Defendant considers that the evidence on Specification 2b corroborates that on 2a. Bell actually testified that he placed one $.05 or $.10 bet with Reil, evidently a numbers bet. If Bell had testified to a horse bet, more corroboration could have been found. He reasoned from the fact he had placed a bet that he must have known he could, *i. e.,* he did not testify to any general reputation Reil had as a conduit for horse or numbers bets. He too was advised by the FBI agent that he personally was not criminally involved, but he was aware of possible disciplinary action by the Navy.

Reil denied all charges on the stand under oath. There was no serious effort to shake his story with cross-examination, but the significance of this must be weighed in light of the fact that the management representative was not a lawyer.

We have held that hearsay testimony is admissible in cases such as this, but whether it is substantial evidence must be weighed in light of the whole record. Kowal v. United States, 412 F. 2d 867, 188 Ct.Cl. 631 (1969); Jacobowitz v. United States, 424 F.2d 555, 191 Ct.Cl. 444 (1970). In Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) the Supreme Court in a Social Security case, where the issue was the plaintiff's disability, held that the administrative tribunal could disbelieve live medical testimony and credit hearsay medical reports. The Court analyzed the whole background and concluded that the agency could reasonably trust the reliability of its hearsay medical evidence. The case cautions us against bringing the hearsay exclusion into administrative proceedings by the backdoor of calling the hearsay evidence not substantial, solely because hearsay. We do not think it would have dictated a different result in our *Kowal* and *Jacobowitz* decisions if it had preceded them, for we did not hold the hearsay evidence insubstantial solely on the ground of its being hearsay, but also by comparing its credibility against that of contrary evidence.

The striking thing about the Byrne statement to Agent Revell is the total absence of all the things that can be done with hearsay statements, signing, swearing, etc., to generate some confidence in their authenticity. As the Agent appeared experienced and well instructed, in his testimony, one can only attribute this to his mistake as to how the statement would be used. In Peters v. United States, 408 F.2d 719, 187 Ct. Cl. 63 (1969) we sustained a removal decision based wholly on hearsay evidence, but we noted that it was all signed and sworn to. We distinguished Conn v. United States, 376 F.2d 878, 180 Ct.Cl. 120 (1967) where the hearsay was unsworn. Another case in which we recognized the difference between different kinds of hearsay, is Glidden v. United

States, 185 Ct.Cl. 515 (1968). *Cf.* also, Fletcher v. United States, 392 F.2d 266, 183 Ct.Cl. 1 (1968).

■ We need not join the dispute between the BAR and the Philadelphia Region, whether the two Byrne statements are in hopeless conflict. Whether they are or not, they show Byrne as a person who did not always tell the same story, the variations being in material as well as immaterial particulars. We do not think the Constitution requires us to ignore the possibility that the self-incrimination he feared, if he testified under oath, might be that he might demonstrate the falsity of one or other of his former statements, or of both. (*Cf.* 18 U.S.C. § 1001.) He was not impartial: his connection with the case obviously was close. He was at the farthest removed from the disinterested doctors of Richardson v. Perales. He was just the sort of witness for whom the art of cross-examination was invented, and whose statements could inspire confidence only if they endured that test. The element of mutual corroboration, as in the four similar affidavits in *Peters, supra,* does not exist here because the conduct described by Byrne, and by Bell, was not sufficiently alike. In all the circumstances, we conclude that Specification 2a is not supported by evidence that is substantial enough in view of Reil's denials on the stand under oath. A trier of fact could not rationally choose to believe the statement taken by Agent Revell (the basis of the specification) over Reil's denials, in view of its lack of authentication, its conflicts with the statement taken by Detective Lewis, and other circumstances. In so holding we are not establishing a rule that unduly impedes the operation of fact-finding tribunals lacking subpoena power (*cf.,* Peters v. United States, *supra*) because the deficiency results in part from failure to employ investigative techniques readily available to such agencies.

■ In another respect the decision is not supported by substantial evidence, even if the Byrne statements are credited. We have seen that the charge was "promotion of gambling" which was more serious than "gambling" and differed in that the offender was not gambling out of his own pocket but was taking bets and making pay-offs on behalf of others. A careful search, however, reveals no evidence that Reil was acting on behalf of others and not on his own account. There is nothing that refutes it either. So far as the cold record goes, one alternative is as likely as the other. If we have our suspicions, based on what we think we know about how things are in Philadelphia, we are not entitled to substitute them for evidence. It does not require demonstration to a court of law, that evidence showing that a person committed either a minor offense, or a separate and discrete major offense, is not substantial evidence that he committed the major offense. It is not any kind of evidence of that.

Thus it is perhaps not really necessary to consider what would happen if we held that substantial evidence supported Specification 2b but not 2a. It does not support either. However, we point to *Jacobowitz, supra,* as a precedent holding that the sustaining of a relatively minor charge does not save a dismissal originally predicated on others that are more serious. We need not add here to the summary but comprehensive coverage of the subject in *Jacobowitz.*

As is usual in such cases as this, the record and arguments range over many other matters which we find it unnecessary to consider. No view is intimated as to them.

There is no triable issue of fact. Plaintiff is entitled to recover. Defendant's motion for summary judgment is denied. Plaintiff's motion for summary judgment is allowed. Judgment is entered for plaintiff. The amount of recovery will be determined in further proceedings under Rule 131(c).