Nichols, Judge,
delivered the opinion of the court:
The plaintiff, a veteran’s preference eligible, brought this action for back pay. After combat service in World War II, during which he flew twenty-five missions over Germany, he entered employment with the Internal Revenue Service and served in it continuously thereafter until removed. On April 23, 1969, he was notified of a proposed suspension and removal from his position as Assistant Chief, Audit Division, Newark, N.J. After plaintiff’s response denying the charges and specifically denying the specifications, he was suspended effective May 5, 1969. On May 27, 1969, Regional Commissioner Dean J. Barron notified plaintiff that he would be removed from the Service as of June 2, 1969. Plaintiff appealed to the Civil Service Commission and a hearing was held in December of 1969; the decision of the Hearing Examiner sustained the removal. Plaintiff appealed to the Board of Appeals and Review of the Civil Service Commission which affirmed the decision.
Plaintiff’s removal came about as a result of his association with Philip Dameo, a noted local citizen, under the following circumstances:
1. On January 15, 1969, “Internal Auditor” Quarry presented plaintiff with a list of eleven names and requested him to provide the files of the named people from the locked storage room in which they were kept. Plaintiff copied the names from the list and gave his list to Mrs. Lembo who held the only key to the locked file room. She delivered the requested *243 files to plaintiff’s desk and Mr. Quarry took possession of them there. Only plaintiff and Ms immediate supervisor could authorize the removal of files from the locked storage area. At this time plaintiff 'became aware that among these requested files was one on Dameo. He also apparently realized that the files were administrative files of the Organized Crime Division (OCD), which was investigating racketeering in cooperation with the Justice Department’s Strike Force. At the same time, the Audit Division of which plaintiff was Assistant Chief was engaged in auditing the personal income tax returns of Dameo and corporate returns of businesses in which Dameo had an interest. Plaintiff was aware of this activity, but knew nothing of the disclosures in such audits and had no supervisory control over their operation.
2. On April Y, 1969, plaintiff was present at a staff meeting consisting of all division heads and assistants where it was ordered that all files pertaining to Dameo and others were to be transferred immediately to the Internal Revenue Service coordinators assigned to the Justice Department Strike Force in Newark. This was accomplished that same day or the following morning. Neither the plaintiff nor two others in attendance at the meeting made any attempt to disclose the social association with Philip Dameo they all had. On April 10, plaintiff went to District Director Nash and discussed his relationship with Dameo.
The removal proceedings commenced shortly thereafter.
It is important here to set forth the charges and specifications under which plaintiff was removed and the removal twice confirmed upon administrative appeal. The two sections of the Internal Revenue Service Rules of Conduct relied upon to justify the removal action read as follows:
1942.31 Association with Disreputable Persons
Except in connection with official business, employees may not associate with individuals or groups when the association tends to discredit, directly or indirectly, the character, reputation, or integrity of the employee or of *244 •the Revenue Service. Unjustified association with persons wbo are 'believed, or known to be connected with illegal, immoral, or reprehensible activities, is forbidden because the association by the employee might tend to connect the employee or the Service with such activities of these persons. Employees should bear in mind that they will be held responsible in the event of adverse publicity stemming from, or connected with, their association.
1942.83 Self-Disqualification from Certain Assignments
When an employee receives an assignment involving a person acting either as principal or agent, with whom he has had social, business or other relationships of a nature that might impair, or give the appearance of impairing, the employee’s impartiality or independence, he will discuss with his supervisor the possible need to have the matter reassigned. This applies particularly to assignments involving investigation, tax examination, and adjudication of matters at issue between the public and the Service.
Regional Commissioner Barron’s letter of April 23 apprised plaintiff of the charges lodged against him and the reasons for his proposed removal.
Charge I. Association with Individual Believed to be Connected with Illegal Activities, in Violation of Section 1942.31, Rules of Conduct for Internal Revenue Service Employees (Rev. 10-63).
Specification 1. You have regularly been in the company of and have associated socially with Philip Dameo, who is known to you by virtue of yowr official position as a person believed to be engaged in racketeering activities and a close associate of and “front” for Gerardo Catena, who is a racketeer and member of La Cosa Nostra. Specifically,
a. On December 19, 1968, you attended a private party given by Philip Dameo at Arch Restaurant, Short Hills, New Jersey, from approximately 2:00 p.m. to 4:00 p.m.
b. On January 8,1969, you were in the company of Philip Dameo and others for lunch and drinks at the Roost Restaurant, Newark, New Jersey, from approximately 12:25 p.m. to 1:45 p.m.
*245 c. On January 12, 1969, you attended the Super Bowl Football Game at Miami, Florida, with a group including Philip Dameo.
d. On January 21, 1969, while you and two other persons were having lunch at the Boost Bestaurant, Newark, New Jersey, during the period from approximately 12:12 p.m. to 1:15 p.m., Philip Dameo approached your table, spoke with you, and paid your lunch bill; then, at Philip Dameo’s invitation, you and your companions went into the private area of the dining room where Mr. Dameo’s table was located.
e. On February 19, 1969, after having lunch at the Boost Bestaurant, Newark, New Jersey, you left with Philip Dameo at approximately 2:45 p.m.
f. On February 26, 1969, you and another person met Philip Dameo at the Boost Bestaurant, Newark, New Jersey, at approximately 11:52 a.m.; had drinks at the bar, for which Philip Dameo paid; and proceeded with Philip Dameo to a private dining room for lunch. You remained there in Philip Dameo’s company until at least 2:20 p.m.
g. On March 18, 1969, you had lunch with Philip Dameo and another person in the private dining room at the Boost Bestaurant, Newark, New Jersey, from approximately 12:35 p.m. to 1:20 p.m.
h. On April 9,1969, you and your wife had dinner with Mr. and Mrs. Dameo at the Arch Bestaurant, Short Hills, New Jersey, from approximately 7:20 p.m. to 11:45 p.m.
Charge II. Failure to Seek Disqualification from Assignments Involving a Person with Whom You Had Social Belationships, in Violation of Section 1942.83 of Buies of Conduct for Internal Bevenue Service Employees (Bev. 10-63).
Specification 1. On January 15, 1969 Internal Auditor Edward Quarry presented a list to you containing names of eleven persons on whom the Justice Department “Strike Force” had requested the Audit Division Organized Crime Drive Administrative files. The name of Philip Dameo was on this list. Although you had a social relationship with Philip Dameo of a nature which might impair, or give *246 the appearance of impairing, your impartiality or independence, you did not advise your superiors of this relationship and discuss with them the possible need to be disqualified from assignments involving him. At this time there were open examinations in the Audit Division on Philip Dameo and two of his corporations, namely, the 1966 and 1967 Individual Income Tax returns of Philip and Molly Dameo, the Corporate Tax returns of Boulevard Dentals, Inc. for year ending January 31,1967, and Corporate Tax return of Cada Realty Corporation for 1966, as well as Organized Crime Drive Administrative Files under your direct jurisdiction.
Specification 2. On April 7, 1969, an official of the National Office requested of District Director Nash, in your presence, that all case files relating to Philip Dameo be transferred immediately to agents under the supervision of IRS coordinators assigned to the Justice Department “Strike Force” at Newark, New Jersey. You failed at this time to advise your superiors of your social relationship with Philip Dameo and discuss the possible need to be disqualified from assignments involving him. (Emphasis supplied.)
Plaintiff bases his case on three distinct arguments. First, he urges that Rule 1942.31 is unconstitutionally vague as written because certain phrases defining the prohibited association are overly broad and vague and because no guidelines are provided as to the requisite reasonableness of any belief with respect to the activities of an associate. Plaintiff also says that the Service’s removal decision is inconsistent with the intent of Section 1942.31 and affronts due process. Because we agree with plaintiff on other grounds, we need not address these constitutional arguments. Alma Motor Co. v. Timken-Detroit Axle Co., 329 U.S. 129 (1946).
Secondly, plaintiff urges that after 28 years of faithful service and with no evidence of corruption, the harsh penalty of removal was excessive and constituted an abuse of the Service’s discretion in these matters. We pass over this until we have determined what specifications are sustainable.
We turn now to the contention of plaintiff that the decision resulting in his removal was not supported by substantial *247 evidence. It is clear from the transcript of the Civil Service Commission hearing that the Service did not rely on the public reputation of Dameo since Dameo, at least at the times relevant here, enjoyed a reputation as a solid citizen with many people of high standing in the community and in the state. He was reputed to be a philanthropist. Judges, high state officials, and members of Congress were happy to be seen in his company. In fact, at the hearing the Government stipulated that Dameo had a public image of being an outstanding figure — a “good”, “spotless”, “favorable” image. (Tr. 6,132,210.) The Government argued before the hearing examiner and before this court that, as a “front” for Gerardo Catena, an alleged notorious racketeer, Dameo would necessarily have a good public image, but the IES knew or believed him to be involved with organized crime. This suspicion apparently had support in the confidential 'files of the OCD or IES. Yet, the majority of the Government’s witnesses, all of whom held high office in the Internal Eevenue Service and knew Dameo personally, testified that they were unaware of any information or belief that Dameo was connected to illegal activity. Edward J. Fitzgerald, Jr., District Director, Newark until 1965, in response to an inquiry whether he was aware of any IES information on Dameo, responded: “I have never had any knowledge of any derogatory information concerning Dameo.” (Tr. 16.) J. Eobert Murphy, Assistant District Director, New York, twice answered similar questions in the negative. (Tr. 27, 34.) William J. McElroy, since March, 1968 Assistant Chief, Intelligence Division, Newark, responded to the same question in the negative. (Tr. 63, 66). A witness for plaintiff, Eobert L. Browne, Assistant Chief and Acting Chief, Intelligence Division, Newark, prior to March, 1968, testified similarly. (Tr. 97-98.)
With all these officials, occupying high level positions of responsibility equal to or higher than plaintiff’s, lacking knowledge of any official information regarding Dameo’s activities, it is impossible to infer that plaintiff knew or should have known of any IES suspicion regarding Dameo’s activities, simply because he worked for IES in Newark.
*248 The sole exception to this ignorance of any official suspicion of Dameo’s character was John Gr. Cassidy, Group Supervisor, Audit Division, whose group was engaged in OOD work. Cassidy testified that he had at some remote time informed plaintiff that Dameo was mixed up in the rackets. Though he didn’t say so to plaintiff, his basis for this accusation was the fact that Dameo had appeared before the Kefauver Committee sometime in 1951 or 1952. We may take judicial notice that having to testify before the Kefauver or any other Congressional committee is not proof of guilt, especially where, as here, there was no follow-up by law enforcement officials. The Hearing Examiner excluded from evidence the actual hearing. Even Cassidy did not see plaintiff’s association with Dameo as a serious offense. He testified that he did not report plaintiff to his superiors despite the existence of Eules requiring him to report fellow IES employees suspected of having unwholesome associations. (Tr. 39.) He further testified that he didn’t consider his submission to plaintiff of an audit plan of an associate of Catena to be inimical to the interests of the Service, even though he knew at the time of plaintiff’s open association with Dameo. (Tr. 44.) As late as 1965, Cassidy sat at Dameo’s table at a Saints and Sinners affair and didn’t report this contact to his supervisors. (Tr. 52.) In fact, Cassidy apparently didn’t see enough wrong with plaintiff’s friendship with Dameo to report it to anyone but plaintiff. (Tr. 59.)
It would seem there would always be great difficulty in proving that an IES employee had violated § 1942.31 by associating with a person of good public repute, if he had no occasion to know of derogatory information in performing his official duties, and the agency took no steps to apprise him of it. How the agency went about warning plaintiff, here, is the most curious feature of the case. The first inkling was the January 15,1969 request for eleven files through Mr. Quarry. The request was in the form of an otherwise blank sheet of paper listing eleven names together with Quarry’s oral representation that “They asked me to pick these files up.” There appears to be some conflict in the testimony on the wording used at the time; Quarry recalled that he told plaintiff that *249 be had a “list of racketeers” and he had been instructed to get their files.
It is clear, however, that someone in the IRS hierarchy suspected Dameo’s activities and was aware of the existence of a file on him located in the lock room under the supervision of plaintiff. It is also clear that that someone also knew of plaintiff’s social relationship with Dameo. The record reveals how Quarry’s “errand” was set up and, inferentially, its purpose. On January 14, another agent named Frank Santella instructed Quarry that Santella would give Quarry a list of names — ■
and that I was going to have to get the files from Mr. Oiambelli because at that particular time we didn’t have anyone working in the Audit Division and since I had already begun my (inspection) audit, that I would be the logical one to reguest fies which normally would be reguested by someone who was auditing the Audit Division rather than the Intelligence Division. (Emphasis supplied.) (Tr. 76.)
Quarry was not at the time involved in OCD activities nor did he have any apparent authority in OCD activities. His instructions as to what to do and what to say came orally from Santella. The source of Santella’s instructions is unrevealed by the record.
This effort to “apprise” plaintiff of Dameo’s suspected underworld connections was ineffective so far as plaintiff at that time neither severed his connection with Dameo nor discussed with his supervisors the necessity of changing his assignments. Perhaps this is so because of the fact that Dameo’s file, alone among the eleven, was quite thin, indicating the presence of information '(possibly of early vintage) of no substantial current interest. Plaintiff could not have opened and read it and did not. Plaintiff claims this “errand” was an attempt by the Service to “entrap” him. We need not address this contention. If it was not “entrapment”, it was certainly a trap.
Good faith or not, we do not believe that the facts, if any, revealed to plaintiff under these circumstances are sufficient to put plaintiff on notice that he was associated with a person who is “believed, or known to be connected with illegal, im *250 moral, or reprehensible activities.” We note that the regulation relates to a present belief of present connection. There is no evidence of the vintage of Dameo’s file, yet it seems (in light of the “present” implications of the regulation) that this fact would be vital to the Government’s removal action and its accusation of the proscribed association. The mere existence of a file on Dameo, absent other information, could perfectly well have denoted that at some past date Dameo was investigated and cleared of suspicion. This could have occurred at the time of the Kefauver hearing. Nor has there been any evidence offered to indicate that the presence of a file on a person in the OCD records indicates an IRS or Strike Force knowledge or belief that the named person is “connected with illegal, immoral, or reprehensible activities.” We note particularly plaintiff’s testimony that, coincidentally or not, on the day before, January 14-, there was circulated in the Newark office a list of 166 names which purported to identify all persons under OCD scrutiny in New Jersey and Dameo’s name did not appear. (Tr. 200-201.) Plaintiff also testified that he did not believe that a person having a file in OCD is necessarily “connected with illegal, immoral, or reprehensible activities.” (Tr. 199.)
On the basis of the evidence in the record, it cannot be found on substantial evidence that after and as a result of the January 15 file request plaintiff knew or believed Dameo to be connected with illegal, immoral, or reprehensible activities or that his association with Dameo was forbidden.
It is clear, however, that on and after the April 7 meeting and file transfer, plaintiff knew or should have known that Dameo was under active scrutiny by the Strike Force. The Government relies heavily upon plaintiff’s failure to disassociate himself from Dameo until April 10 to support his removal. Upon learning of the Service’s suspicions, what is plaintiff to do? Defendant claims that the Rule contemplates that he must immediately terminate the prohibited association. But we must also consider whether what plaintiff did after acquiring this knowledge was reasonable. It would seem that any person would need some length of time to decide whether to or how to terminate a longstanding and *251 intimate friendship. To anyone this would be a weighty problem. Moreover, it is credible, plausible, and uncontroverted, as plaintiff suggests (Tr. 172-73) in his letter of May 8, 1969, responding to the charges:
* * * as of April 7, having had the information come to my attention that he is apparently under investigation, I immediately determined never to associate with him again. However, I was placed in a very difficult position. The (birthday) party (for Mrs. Crecca) had been called. I knew I would not be alone with the Dámeos; I knew that our wives and the other persons * * * would be present, and under those circumstances, rather than reveal to anyone the fact that I could not attend because of my position with Internal Revenue Service, I decided not to make any waves, but rather to let this thing occur in a normal course and thereafter to be certain never to permit myself or my wife to be associated in any way with Philip Dameo or with any member of his family. Since that dinner date I have not associated with him in any way.
Defendant made no attempt to controvert this answer and explanation but chose to rely on the fact that the event was after April 7 and thus sufficient to damn plaintiff for unwholesome association. Yet it is entirely possible that the invitation for the party had been accepted and that it would be difficult to withdraw without divulging to Dameo more than the IRS then wished him to know. There is nothing to show that anything occurred respecting Dameo between April 7 and 10, other than the party itself, so plaintiff’s delay in giving notice occasioned no prejudice to defendant.
Of the eight specifications under Charge I, seven of the alleged “associations” occurred before the date when plaintiff became aware, by virtue of his official position, of the Service’s interest in Dameo. And the other raises serious problems. The Government does not deny that plaintiff has ended his association with Dameo, so it is left with the birthday party as the only instance of the prohibited association, with undisputed mitigating factors.
In Jacobowitz v. United States, 191 Ct. Cl. 444, 424 F. 2d 555 (1970), this court held that where the court found some *252 charges invalid and where the remaining charges are minor in nature, dismissal based on the remaining charge would be an abuse of discretion. And we have recently held that this rule applies also to surviving specifications under a single charge. Reil v. United States, 197 Ct. Cl. 542, 456 F. 2d 777 (1972). Assuming arguendo, then, that substantial evidence supports Specification 1 h, it cannot stand alone as a basis for removal.
The Service, in Charge II, sought to remove plaintiff on the basis of his failure to seek disqualification upon receipt of an “assignment” involving a personal acquaintance or failure to discuss with his supervisors the necessity of having the matter reassigned. Defendant urges that there were three such “assignments” from which plaintiff should have disqualified himself:
a. his continuing authority over the files in the lock room from which Dameo’s files were removed on J anuary 15,1969,
'b. the January 15,1969, action itself,
c. his position as administrator in a group known to him to be auditing the returns of his friend Dameo.
We presume that Internal Revenue employees are ordinary people and that a regulation to guide their conduct, to be understood, would use words in their ordinary meaning in common speech, unless the contrary is shown, as it has not been here. Webster’s Third New International Dictionary (3d Ed. 1968) defines “assignment” as below:
Ha a position, post, or office to which one is assigned; appointment (his * * * as vice-consul in Liverpool) (his * * * as minister of two rural churches) ; 5 a specified amount of work or a definite task or mission assigned by authority or undertaken as though so assigned (a * * * of 10 arithmetic problems) (the reporter’s * * * was to interview the congressman).
It is clear that not every task or duty is an “assignment”. It is also obvious that under the regulation an “assignment” commences with “receipt” and involves another “person” and therefore it speaks in the ¡25 sense, of parts of the entire job, not Ha which denotes the whole. The parts are finite parts; the regulation contemplates that the employee “receives” an *253 “assignment” as a reporter is directed to interview a congressman; an assignment be finishes and then is ready for another. In the context of auditing tax returns, the duty of self-disqualification in case one is assigned the return of a friend, is easy to implement, and another “assignment” can immediately be made, with no impairment to the Service, unless the revenue agent knows everyone in the district. If the “assignment” does not involve “investigation, tax examination, and adjudication of matters at issue between the public and the Service,” it must, by nosoitur a sooiis, be of a similar kind. We do not think that a permanent, ongoing part of an employee’s duties is, in common speech, an “assignment”. Thus, as to a GSA guard in Baylor v. United States, post, at 331, guarding the Pentagon might be his “assignment” for a particular week, but putting on his uniform would not be, though it was his duty.
We conclude that a reasonable man reading Rule 1942.83 would not view a continuing responsibility for authorizing access to a locked file room to be an assignment within the Rule. Moreover, it has not been shown that plaintiff even had access to the room; Mrs. Lembo had the only key. Plaintiff’s authority was limited to authorizing release of the files to others upon proper request. But the telling point of all this is that prior to January 15, 1969, plaintiff had no way of knowing, and defendant did not undertake to show, that Dameo’s file was even in the file room. It is clear that he did learn on January 15, but he was simultaneously divested of control over the file when Quarry took it away. Thus it appears that at no time was plaintiff as master of the file room aware of any matter which would cause him to seek reassignment, particularly since the “matter” had already been transferred.
The January 15 errand considered separately, perhaps was an assignment within the dictionary definition, but it was not the type of mission contemplated by the Rule, which reads in part:
* * *. This applies particularly to assignments involving investigation, tax examination, and adjudication of matters at issue between the public and the 'Service.
*254 This sentence emphasizes the purpose of the rule and impliedly defines the assignment as assigning some vestige of control over the resolution of the dispute or investigation and containing judgmental or discretionary factors. Yet plaintiff’s acts following Quarry’s request consisted of writing down the names and handing his 'list to Mrs. Lembo for her to fetch the files. This simple clerical task could not by any stretch of imagination “impair, or give the appearance of impairing, the employee’s impartiality or independence.” What could be more impartial than this simple clerical act?
The last contention by defendant is that plaintiff as Assistant Chief of the Audit Division was aware of his group’s ongoing audit of Dameo’s returns and should have sought self-disqualification 'because of that. What defendant overlooks is: first, plaintiff had no control over any decisions made in connection with the subject audits; second, he had no knowledge of the details of the audits, merely knowledge that they were in progress; third, these audits were not the personal assignment to him that the Rule contemplates; and finally, the responsibilities of plaintiff’s position included neither the examination of taxpayers’ returns nor the supervision of such activities. (Tr. 143.) As to plaintiff’s duty to discuss the possible need to have the matter reassigned, as noted previously, plaintiff had no assignment to reassign; but more importantly, his immediate supervisor, Joseph Grisolfi, knew of his association with Dameo and was also aware of the pending audit within the group. (Tr. 144-46.)
In conclusion, plaintiff had no assignment which would compel him to discuss the necessity for self-disqualification; plaintiff’s association with Dameo was innocent until he learned of the Service’s interest in Dameo’s possible underworld connections; seven of the eight specifications under the prohibition of association occurred before plaintiff had acquired the requisite knowledge; the eighth specification is insufficient by itself. Therefore, we find that plaintiff’s dismissal under the charges and specifications was not supported by substantial evidence and was wrongful. So far as concerns Charge II, the defendant did not adduce any evidence that plaintiff violated Section 1942.83 of the Rules.
Plaintiff’s motion for summary judgment is granted. Defendant’s motion for summary judgment is denied. Judgment *255 is entered to that effect, with, the amount of recovery to be determined under Rule 131 (c).