### NATIONAL LABOR RELATIONS BOARD v. NATIONAL DIE CASTING CO.
### No. 10877.

United States Court of Appeals,
Seventh Circuit.

Oct. 9, 1953.

A. Norman Somers, Asst. Gen. Counsel, Ivan C. McLeod, Washington, D. C., George J. Bott, General Counsel, David P. Findling, Associate General Counsel, Frederick U. Reel, Ruth C. Goldman, Washington, D. C., for petitioner.

Russell Packard, Chicago, Ill., for respondent.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

The National Labor Relations Board has filed its petition for enforcement of its order entered May 25, 1951, based upon its finding that respondent, following a temporary shut-down of its plant for legitimate economic reasons, had discriminatorily failed to reinstate five employees because of their membership in and participation in the work of a union committee. The sole question involved is whether, on consideration of the record as a whole, the evidence supports this finding.

The hearing was conducted by an examiner who died before he had prepared his report. A successor examiner then considered the evidence that had been taken and recommended the order which the Board entered.

■ The complaint originally charged violation of the act by way of discriminatory refusal to recall eight employees. Two of the eight the reporting examiner concluded had not been discriminately treated, one a young lady, and the other, one Sullivan, who had been president of the union and who, upon offer of reinstatement, declined reemployment. Upon review, the Board found that respondent had attempted to reinstate another employee, Obermeyer, but had been unable to find him. Consequently the final order applies to but five employees. It is obvious that inasmuch as neither the reporting examiner nor the Board saw or heard the witnesses testify, and the evidence taken by the deceased examiner came before the successor examiner after it had been transcribed, the usual advantages enjoyed by the trier of the

facts in seeing and hearing the witnesses and in determining the credibility which should be extended to them are not present. Consequently we have found it necessary to scrutinize the evidence closely.

For some years prior to 1949 the company and the union had cooperated amicably under an employment contract, renewed from year to year. This agreement was to expire on May 18, 1949 and notice of its final termination, by voluntary act of the union, was given on April 14, 1949. The relationship between the employer and the union and its members during the existence of the contract was friendly and cooperative and the evidence reflects continued operation characterized by a scrupulous adherence to the agreed terms by both parties thereto. There is no evidence of remarks or threats by the employer antagonistic to the union or the employees.

Respondent was engaged in production and sale of home appliances, principally "orange juicers". It had been prosperous and continued so until the fall of 1948, when its inventory began to increase alarmingly because of a drop in sales caused apparently by the increased sales of concentrated frozen orange juice. The popularity of this latter product with the public immediately reduced the demand for home fruit juicers. Sales dropped, production out-ran demand, inventories grew inordinately and, as the months proceeded, the situation grew worse and worse, despite strenuous efforts to increase sales and to cut down inventories, so that in April, 1949, the volume of sales had sunk to less than 30% of what it had been in the summer of 1948. The company's financial situation in the beginning of 1950 was foreboding. In efforts to retrench, the company first cut the work week from 45 to 40 hours in order to keep as many employees as it could. In March, 1949, it made an additional cut to 32 hours. Shortly later the zinc market broke badly, bringing to the respondent an inventory loss of $2000 for each carload of metal on hand. Apparently the problem could not be solved without finding new

products, and the company came to the conclusion that it was necessary to shut the plant down, at least temporarily. On Monday, April 25, it posted a notice to all employees informing them that because of the existing conditions the plant would be closed indefinitely at the close of business on April 28, 1949, with the exception of the tool shop, which would remain open in order to continue work on tools and dies, looking to the manufacture of new products. There were 16 employees in that room.

The shop committee of the union, led by George Fulk and Peter Nardi, upon receiving notice of the shut-down, protested to the company that it should keep the stewards employed even though there was nothing for them to do. The company did retain Zabski, the union's tool room steward and committee member, as that room was continuing in operation. Fulk approached President Johnson, who advised him that there was no work for the stewards. Johnson testified that Fulk replied "you will have a strike on your hands. Nobody will be able to go in and out of the plant, including the office force." On the day of the shutdown, strike rumors floated around the plant, and Nardi and Fulk circulated through the plant passing word to stewards to promote employee action and get union members to a strike meeting. Pinta, business agent for the union, advised the management that "there would be trouble with the company" and that if the stewards did not "come in, nobody else would come in either." At the strike meeting the tool employees expressed resentment at the protest against their being retained, pointing out that if they did not continue their work it would take that much longer to get new tools and dies into production for new products and that everyone would suffer. However, a strike was voted. On Monday, May 2, certain of the employees appeared in front of the plant. Whether the men there congregated constituted a picket line, it is unnecessary to decide, for they dispersed about nine o'clock. The tool

room employees then went into the plant to work and nothing more was heard of the strike.

In February, 1949, some two months before the shut-down, when the business was approaching its last decline, the union sent the company a 60-day notice concerning negotiations for revision of the contract. No further communications between the parties occurred until March, when Pinta telephoned President Johnson and asked for a date for negotiation. Pinta testified that Johnson said that the condition of the company was such that it would do no good for the company to negotiate just then. Johnson says he told Pinta he was devoting all his time to reestablishing business. At any rate nothing happened at that time and Pinta said he would call again in a couple of weeks. This he never did. There were no further contacts with the company concerning revision of the contract or negotiating a new one.

While the plant was closed, the employees in the tool room, including Zabski of the union committee, were working on new experimental models and dies and making handmade samples to send to the trade. Line production was resumed in June, 1949, but the slight uprise in business soon disappeared, so that in July, 1950, the number of employees had fallen to less than the number employed at the time of the shutdown.

Despite these essential facts, the examiner and the Board each drew an inference that the company had exhibited an antipathy toward the union and a further inference that in refusing to reinstate certain employees it did so because of this antipathy and its desire to discriminate against the members of the union in employment. Despite the fact that the complaint charged only discriminatory discharges and did not complain that the company had failed to negotiate, the examiner found that the company had failed to negotiate and from that finding drew the inference of antipathy toward the union. The examiner con-

sidered the evidence upon this issue although he reported that at the hearing, the general counsel of the Board specifically informed counsel for respondent that there was no charge that respondent had refused to negotiate and that such a refusal was not an issue. Despite this situation and over respondent's objection to the evidence, the examiner and the Board found that there was a refusal and that it in turn justified an inference of antipathy to the union. We have searched this record in vain for any substantial evidence justifying either the finding or the inference. There is certainly no direct evidence that the respondent ever refused to negotiate or to bargain. The very most that can be said in this respect is that the company, faced with financial ruin, took the position that negotiation of a new contract at that time was useless because of the financial situation and asked that the matter be postponed indefinitely. Though the business agent so testified, he did not thereafter attempt to initiate negotiations. We can only conclude that there was no refusal upon the part of the company to negotiate; that the injection of the issue into this case over and beyond what was charged in the complaint was unjustified, and that the findings and inferences of the examiner and the Board in this respect are wholly unsupported by substantial evidence. Consequently the question remaining is whether the company, in amicable and friendly relations with the union for the preceding years, acted discriminatorily in refusing to reinstate five employees because they were connected with the union.

▇ Two of the employees, Nardi and George Fulk were members of the shop committee of the union. When they learned that the company would not yield to their demand that respondent retain during the shut-down the union stewards, although there was no labor for the latter to perform, they began activity immediately. The contract still in force between the parties provided that it should serve as means for

settlement of all disputes; that the company would not engage in any lock-out and that the employees would not strike, or interfere with or restrict production in any department of the company; that no member of the union would take part in any of such practices during the life of the agreement and that any employee who should violate the provisions of the contract "shall be considered to have quit his job." The examiner and the Board concluded that there was no strike and, therefore, no violation of this contract by Nardi or Fulk. But the agreement is not merely to refrain from striking. It is a contract also not to interfere with or restrict production. The record discloses beyond any question that after the notice of the shutdown Nardi and Fulk passed about the plant during working hours, stopping first one employee and then another at work and approaching those working on the various machines in the plant. Though they were ordered back to their jobs, they persisted in this conduct, making it clear that they were guilty of deliberate and dangerous interference with production in their attempts to stir up a strike because the stewards were not to be kept in the plant while the tool men were allowed to continue employment. They not only disregarded their own duties but subjected their fellowmen to hazards in clear violation of their contract and shop rules. There was, as we have seen, a gathering in protest against the entry of the tool room men. Whether there was a strike or not, whether one actually came into existence, and then died a short death, are questions wholly immaterial in the disposition of the question of the rightfulness of the refusal to reinstate these men. They had violated the contract by such conduct as automatically removed them from the category of employees, a contract voluntarily made and binding upon them.

An employer has the right to demand the single-minded attention of the employee to his work, for in a manufacturing plant, the performance of work with

efficiency and without physical danger depends not only upon the devotion of the employees to their work but also upon the amity with which they cooperate. Otherwise, they subject the other employees to grave safety hazards in clear violation of the contract and ultimately remove them from protection. Midland Steel Products Co. v. N. L. R. B., 6 Cir., 113 F.2d 800, 805; N. L. R. B. v. Montgomery Ward & Co., 8 Cir., 157 F.2d 486, 496. As the Supreme Court said in N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 514, 83 L.Ed. 682, the Act "does not prohibit an effective discharge for repudiation by the employe of his agreement, any more than it prohibits such discharge for a tort committed against the employer. * * * the breach of contract of which the men were guilty left the company under no obligation to initiate negotiations for a new and different contract of employment with them. * * *" As we said in United Biscuit Co. v. N. L. R. B., 7 Cir., 128 F.2d 771, at 776 "reinstatement of those who admittedly breached their contract will not effectuate such policies." See also N. L. R. B. v. Electric Vacuum Cleaner Co., 6 Cir., 120 F.2d 611; Hazel-Atlas Glass Co. v. N. L. R. B., 4 Cir., 127 F.2d 109; N. L. R. B. v. Draper Corp., 4 Cir., 145 F.2d 199. We conclude that Nardi and Fulk, by their own voluntary conduct in interfering with production in breach of their contract with the plaintiff, placed themselves in the category of non-employees as a result of which the company was under no further duty to consider them as employees or to reinstate them after the plant reopened.

The other three former employees who were not reinstated were Ira Fulk, Tincher and Parenti, constituting part of the members of the shop committee. The first, Ira Fulk, had been an elevator operator. The only finding possible from the evidence is that he was competent to fill only the simplest of jobs, such as polishing and buffing the "heads" of the devices made. The more complicated parts of the manufacture were reserved for more skilled employees. He did enjoy relatively high earnings, and from this the Board argues that he must have been a valuable man. But the record is conclusive that he was able to earn such high wages because the rate structure at the plant permitted a man on simple operations to turn out a large volume and thus earn more than a man working on slower, more skilled work. The policy may not have been the wisest, but it explains fully the cause of Fulk's earnings in his comparatively simple work. When the plant reopened there was none of this labor for him to do. An excess inventory of finished "heads" was already in existence and there was no place for him in the more complicated work then in progress in which he had had no experience. The company had changed its models and needed men who were skilled and could do chrome work which Fulk had never done. In this situation, in view of the fact that the work which he formerly had done was no longer required, there was no violation of the Act in failing to reinstate him. Ballston-Stillwater Knitting Co. v. N. L. R. B., 2 Cir., 98 F.2d 758, 763.

Tincher, during all of his employment by respondent, was a hand filer, whose duty it was to clean excessive metal from new castings. After the plant reopened, hand filing was practically eliminated, in order to reduce expense, in line with the retrenchment program. There had been some four such filers, but, after reopening, only two were required. Each of the two men recalled exceeded Tincher in seniority. The Board seemed to think that Tincher was able to do most anything, but the record is that he never did anything for this company except filing.

Parenti worked on the tumbling tubs burnishing aluminum castings. He had had no experience in handling "irriditing" and plating work, with which this process was combined when the plant reopened. Tumbling is a mechanical function; the parts to be burnished are placed in a container apparatus and

"swished" about to smooth the rough spots. Plating and irriditing are electrolytic processes which require considerable education and chemical knowledge. Parenti was not a chemist and had had no chemical training. He had done no plating work and had no experience in irriditing. Consequently when the plant reopened, the need for tumbling and burnishing being very small, this kind of work was never resumed on a full-time basis and such tumbling as was necessary was handled by a man who could handle all three operations.

We think it inescapable, from our examination of the record, that these three cases embraced only situations where jobs had been abolished or combined with other jobs so as to cut costs, amounting to economic action with which the Board may not interfere. Thus, in Martel Mills Corp. v. N. L. R. B., 9 Cir., 114 F.2d 624, 633, the court said: "Where economic considerations necessitate a contraction in the employer's labor force, the employer, in deciding which employees are to be retained, must be free to choose from the more capable and the more worthy. * * * Cf. Jefferson Electric Co. v. N. L. R. B., 7 Cir., 102 F.2d 949, 957". See also N. L. R. B. v. Montgomery Ward & Co., 8 Cir., 157 F.2d 486, 493; N. L. R. B. v. Boss Mfg. Co., 7 Cir., 107 F.2d 574, 579. We think no conclusion is justifiable except that economic reasons alone constituted the grounds for failure to reinstate these three men.

It would appear that rather than justifying an inference that these employees were not reinstated because of the company's so-called antipathy for the union, the evidence warrants only the contrary inference that the company had no prejudice against the union. Thus the ex-president of the union was offered reinstatement and declined; Obermeyer, a member of the same committee as Fulk and Parenti, was offered reemployment, that is to say, the company tried to locate him to offer reemployment. The Board could find no evidence to justify an order to reinstate him. In other words, the conduct of the company, in taking back union men, in offering employment to the former president of the union and in attempting to procure reinstatement of Obermeyer, another member of the shop committee, disclosed no antipathy but only friendliness with the union and its members. The five exceptions involved in this case were all, upon careful examination of the evidence, justified refusals to reinstate, not because the company had antipathy toward the union or discriminated against them as members of the union but merely because conditions in the plant were such as not to justify their reemployment or, as in the case of the first two mentioned, because they had violated their contract. As we said in N. L. R. B. v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680, the burden was upon the Board to prove affirmatively and by substantial evidence that the failure to reemploy was because of union membership and activities and for the purpose of discouraging membership in the union. We adhere to that doctrine and find no basis in the record for the finding or the inferences of the examiner and the order based on them. N. L. R. B. v. MacSmith Garment Co., 5 Cir., 203 F.2d 868.

We conclude, therefore, that there is nothing in this record to sustain a finding or an inference that the company had any antipathy for the union. Rather the evidence discloses only one possible fact in this connection, namely, that the relationship between the union and the company was at all times friendly and amicable. There is no proof that the company failed to negotiate. Indeed, such conduct was not even charged. The men were discharged not because of their affiliations with the union but because of other good and valid reasons. Consequently the petition for enforcement must be and is hereby denied.