James W. **HENLEY**, Jr., Plaintiff,

v.

**UNITED STATES of America**
**Robert E. Hampton, et al.,**
**Defendants.**

**Civ. No. 73-341.**

United States District Court,
M. D. Pennsylvania.

Aug. 13, 1974.

Elliot A. Strokoff, Handler, Gerber &
Weinstock, Harrisburg, Pa., for plaintiff.

S. John Cottone, U. S. Atty., James W.
Walker, Asst. U. S. Atty., USDJ for the

Middle District of Pennsylvania, Scranton, Pa., for defendants.

## MEMORANDUM AND ORDER

HERMAN, District Judge.

The plaintiff is a former criminal investigator for the Bureau of Alcohol, Tobacco and Firearms (ATF) of the Internal Revenue Service, now a bureau of the United States Treasury. The essence of the action is an attempt to secure his reinstatement to that position, a position from which he was dismissed pursuant to the Lloyd-LaFollette Act, 5 U.S.C.A. § 7501.

The plaintiff was dismissed on May 19, 1972, to "promote the efficiency of the service," and so remains to this date.[1] That same date the plaintiff filed a complaint (Civil No. 72–265), and thereafter, on May 23, 1972, moved this court for a preliminary injunction requiring immediate reinstatement. The court conducted a hearing and on June 12, 1972 denied the motion. We concluded this court to be without authority to intervene prior to exhaustion of established administrative procedure. Subsequently, the Supreme Court likewise concluded that a district court is indeed without such authority. Sampson v. Murray, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

Following denial of the injunctive relief, the plaintiff returned to the machinery of the administrative procedure act. The internal appeals procedure followed by the plaintiff was unsuccessful.[2] On June 25, 1973 the plaintiff filed the instant complaint before this court seeking judicial review of the administrative action. The issue was joined by cross motions for summary judgment.

It is undisputed that James W. Henley, Jr. was removed, without pay, *prior* to any hearing.

█ The plaintiff raised the following points in criticism of the administrative procedure:

a.) No pre-dismissal hearing was afforded him as a non-probationary employee.[3]

b.) The post-dismissal hearing was a denial of due process in that it did not provide for confrontation and cross-examination of the plaintiff's accusers.

c.) The findings of fact of the hearing examiner were arbitrary, ca-

1. The charges against Henley are reproduced in full in the Appendix to this memorandum. During the administrative review and appeal procedures, Reasons 1 and 4 and all the specifications thereunder were dismissed as unsubstantiated. Likewise, the following specifications were also dismissed: Specification 2 of Reason 2; Specification 1 of Reason 5 and Specifications 5, 7 and 8 of Reason 7. All the remaining charges are before this court for consideration.

2. On February 28, 1972 the plaintiff was given a written notice of proposed adverse action. In it he was informed of the reasons (see Appendix) and allowed 10 days to provide a written explanation, which he did. Notwithstanding the plaintiff's explanation, on May 11, 1972 he was informed that he was being dismissed effective May 19, 1972. A timely appeal was taken to the Internal Revenue Service Appeals Examiner. A hearing was held July 19, 1972 and on September 1, 1972 the plaintiff's dismissal was sustained. During this period of time the ATF was removed from the administrative

jurisdiction of the IRS. On or about October 18, 1972 the plaintiff was informed of the change and advised that it did not affect his removal. On October 20, 1972 the plaintiff exercised his right of appeal to the Philadelphia Region of the Civil Service Commission. On February 14, 1973 the removal was again sustained. On February 20, 1973 an appeal was filed with the Board of Appeals and Review of the Commission which affirmed the dismissal on May 31, 1973. On June 25, 1973 the instant suit was initiated in this court.

3. It seems clear to this court that the plaintiff possesses the sort of property right which requires at least minimal due process. Arnett v. Kennedy, 416 U.S. 134, 167, 94 S. Ct. 1633, 1651, 40 L.Ed.2d 15, 41 (1974) (Powell, J. concurring); Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

pricious and not supported by substantial evidence.

Although the court heard argument on the issues some time ago, the parties agreed that this court should withhold its decision pending the outcome of Kennedy v. Sanchez, 349 F.Supp. 863 (N.D. Ill.1972), cert. granted, 411 U.S. 915, 93 S.Ct. 1549, 36 L.Ed.2d 306 (1973). Recently the Supreme Court reversed the three-judge court sub nom., Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

■ The Supreme Court in Kennedy rejected the attack on the Administrative Procedure Act insofar as it denies pre-dismissal hearings.

The Court emphasized that in a motion for summary judgment the district court must accept as true "the material particulars of . . . [the employee's] conduct which were set forth in the notification of proposed adverse action . . . ." 416 U.S., at 140, 94 S.Ct., at 1637, 40 L.Ed.2d, at 25. Taking as true the charges as outlined in the Appendix to this memorandum, we conclude that the instant case is of the type which in Kennedy permits dismissal *prior* to a hearing. *Id.*, at 160, 94 S.Ct., at 1647, 40 L.Ed., at 37.

The plaintiff has argued in a supplemental memorandum that we should not embrace Kennedy too tightly since it involves a plurality of only four Justices. Indeed, it is more difficult to find definitive rulings of law in such a decision. Nevertheless, the Court was sufficiently in agreement to reverse the three-judge

court on this point as well as on a First Amendment question not relevant to the instant case. Therefore, the court is of the opinion that the plaintiff's first issue requires no further discussion and must fail.

The plaintiff next claims that the procedures employed in his post-termination hearing were constitutionally defective, in violation of the Sixth Amendment.[4] The primary objection to the hearing was the plaintiff's inability to confront or cross-examine the witnesses against him. The government's response consists of seeking refuge behind 5 C.F.R. § 722.305(c) which undeniably prohibits the Civil Service Commission from issuing subpoenas to compel the attendance of witnesses.[5] The effect of that lack of subpoena power was evident in the array of evidence. The government presented only two live witnesses, both employees of the IRS and neither of whom had any direct personal knowledge of the charges against the plaintiff. Pursuant to 5 C.F.R. § 772.305(c)(2), agency employees are made available for testimony. The remainder of the government's evidence, discussed *infra*, consisted in part of unsworn and even unsigned statements. The plaintiff had no means to compel testimony on his behalf. Consequently, none of the persons who gave statements could be compelled to submit to cross-examination.

■ Neither side has questioned this court's authority to pass on the constitutionality of 5 C.F.R. 772.305. Ordinarily a single judge cannot declare a

---

4. The plaintiff has not alleged that the agency failed to follow established procedures, but rather that the procedures employed are inherently insufficient.

5. § 722.305(c) *Hearing Procedures.*

"(1) An appellant is entitled to appear at the hearing on his appeal personally or through or accompanied by his representative. The agency is also entitled to participate in the hearing. Both parties are entitled to produce witnesses. The Commission is not authorized to subpoena witnesses.

"(2) An agency shall make its employees available as witnesses at the hearing when

(i) requested by the Commission after consideration of a request by the appellant or the agency and (ii) it is administratively practicable to comply with the request of the Commission. If the agency determines that it is not administratively practicable to comply with the request of the Commission, it shall submit to the Commission its written reasons for the declination. Employees of the agency shall be in a duty status during the time they are made available as witnesses. Employees of the agency shall be free from restraint, interference, coercion, discrimination, or reprisal in presenting their testimony."

federal statute unconstitutional. 28 U.S.C.A. § 2282. However, a regulation adopted pursuant to the Administrative Procedure Act, 5 U.S.C.A. § 701 et seq., is subject to scrutiny by a single judge. Holley v. United States, 352 F.Supp. 175 (S.D.Ohio), aff'd without opinion, 477 F.2d 600 (6th Cir. 1973). Furthermore, a three-judge court is not required where a federal statutory scheme is merely construed and not sought to be enjoined. Harlan v. Pa. R. R., 180 F. Supp. 725 (W.D.Pa.1960).

■ Our limited role, then, is to determine whether the plaintiff was unconstitutionally denied the option of cross-examining and confronting witnesses by virtue of his inability to issue subpoenas.

In Goldberg v. Kelly, *supra,* the Court declared that prior to termination of welfare benefits fundamental due process must be satisfied:

> " 'The fundamental requisite of due process of law is the opportunity to be heard.' Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363, 1369 (1914). The hearing must be 'at a meaningful time and in a meaningful manner.' Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965). In the present context these principles require that a recipient have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally. These rights are important in cases . . . where recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." 397 U.S., at 267–268, 90 S.Ct., at 1020, 25 L.Ed.2d, at 299.

Of the preceding, the plaintiff was afforded all but the effective right to confront and cross-examine the witnesses against him. We recognize that this circuit, in a decision rendered without the aid of Goldberg stated:

> "Plaintiff next contends that 5 C.F.R. § 722.305(c)(1), which specifically denies the Civil Service Commission the authority to subpoena witnesses in connection with a hearing in these cases, is ultra vires and violates due process. . . . 'There is nothing unfair in such a procedure' [citing] Cohen v. Ryder [258 F.Supp. 693 (E.L.Pa.), *aff'd on opinion below,* 373 F.2d 530 (3d Cir. 1967)]. No case has been cited holding that this lack of subpoena power denies due process, and we have found none." DeLong v. Hampton, 422 F.2d 21, 24–25 (3d Cir. 1970).

We can only surmise whether this circuit would have ruled differently had it enjoyed the guidance of Goldberg. This court does not view Goldberg and DeLong as contradictory holdings.

DeLong should not be misconstrued to be approval for an agency to hide behind 5 C.F.R. § 722.305(c)(1). Cohen v. Ryder (referred to in DeLong) and DeLong itself, presented factually distinguishable situations in which the witnesses sought were agency employees that could have been produced pursuant to 5 C.F.R. § 722.305(c)(2). This court is inclined to agree with DeLong that a mere absence of an agency subpoena power does not per se constitute a violation of due process.

We are not prepared to rule that the absence of subpoena power is per se a due process violation, because to so rule would permit an employee to block his removal without regard to the quality of the case against him.

It is entirely possible that an agency without subpoena powers could secure the voluntary appearance of witnesses whose testimony would be sufficient to establish a substantial case. Moreover, we note that the plaintiff has not claimed that the lack of subpoena power prevented him from obtaining witnesses favorable to his position. The record establishes the contrary.

Rather than allow this case to turn on the issue of the existence of subpoena power, we find the key issue to be the nature and sufficiency of the evidence against Henley. The subpoena power is only tangentially relevant in that the government implies the lack of compulsory attendance required reliance on written statements.

■ The plaintiff has not questioned that if the charges were true and adequately proved they would justify his dismissal. Indeed, the punishment selected is beyond our scope of review. Jaeger v. Stephens, 346 F.Supp. 1217, 1226 (D.Colo.1971). The court further notes that although Kennedy, *supra*, requires us to accept the charges against the plaintiff as true for purposes of the motion for summary judgment, such a procedural expedient does not extend to our review of the sufficiency of administrative findings of fact.

■ We are mandated to review the Commission's findings to determine if they are supported by "substantial evidence" or if they are arbitrary or capricious. Charlton v. United States, 412 F.2d 390, 393 (3d Cir. 1969). Substantial is more than a mere scintilla and must do more than create a suspicion of the existence of the fact sought to be established. N. L. R. B. v. Arkansas Grain Corp., 392 F.2d 161 (8th Cir. 1968). The evidence must afford a "substantial basis of fact from which the fact in issue can be reasonably inferred (citations omitted) . . . . and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." N. L. R. B. v. Columbian Enameling & Stamping Co., Inc., 306 U.S. 292, 299–300, 59 S.Ct. 501, 505, 83 L.Ed. 660, 665 (1939); Watson v. Gulf Stevedore Corp., 400 F.2d 649 (5th Cir. 1968), cert. denied, Young & Co. v. Shea, 394 U.S. 976, 89 S.Ct. 1471, 22 L.Ed.2d 755

(1969). Moreover, it is not necessary that the evidence be unequivocal, but merely that it reasonably support the agency findings. Lamont v. Finch, 315 F.Supp. 59 (W.D.Pa.1970); Joyce v. McCrane, 320 F.Supp. 1284 (D.N.J. 1970).

The government (referred to throughout the hearing as "Management") called two witnesses to the stand. First was Paul Hankins, a Special Agent of the ATF. His testimony consisted of giving his opinion about the proper use of a service weapon in conjunction with Reason 1, Specifications 1 and 2. The plaintiff was eventually cleared of the charge by the examiner. Hankins was also the testimonial sponsor for an unsworn letter allegedly sent to him by Evelyn Walters.[6] He also testified as to the contents of time records submitted by the plaintiff. The plaintiff never denied that he prepared the records. Hankins' testimony showed no evidence of personal knowledge of the plaintiff's activities with regard to the charges.

The second and final government witness was Francis Bond, an Internal Security Inspector for the IRS. Bond's testimony consisted of explaining the absence of Orie Peterson, the Inspector who had conducted the investigation of the plaintiff. Peterson was apparently disabled by two heart attacks and was unable to testify. Inspector Bond further testified that he had questioned Miss Walters and a Stephen Spong, an officer of the Lemoyne Police, and that they reiterated the truth of statements given to Inspector Peterson who had originally taken the statements. Inspector Bond also testified that he was told by Miss Walters that she felt that Dorothy Coberly was a truthful person. Mrs. Coberly had also provided an unsworn statement. Inspector Bond's testimony revealed no personal knowledge whatever about the charges against the plaintiff, nor the circumstances of Inspector Peterson's investigation.

6. The letter alleged that the plaintiff had been "bothering" her and that Miss Walters asked Hankins to keep Henley away from her.

The written evidence introduced by the government against the plaintiff consisted of the following: [7]

    (a)  Numerous photocopies of time and worksheets submitted by Mr. Henley, detailing his activities on various days.

    (b)  A typewritten statement [8] bearing the handwritten name Steven Spong, described as an officer of the Wormleysburg Police. In part, his statement accused the plaintiff of using foul and abusive language in Spong's presence when Officer Spong stopped Henley for running a red light. The statement also charges that the plaintiff threatened to arrest Spong.

    (c)  A typewritten statement, almost identical to the preceding, bearing the written name of John R. Hurley of the Wormleysburg Police. The statement corroborated Spong's. However, the second policeman arrived on the scene later than Spong. He was able to verify Spong's version of Henley's conduct.[9]

    (d)  An unsworn, handwritten statement bearing the signature of Evelyn E. Walters, in a handwriting distinctly different from the text. The statement accused Henley of general conduct on unspecified dates including "bothering" Miss Walters, and of being a person inclined to excessive use of alcohol. She also accused Henley of "flashing" his badge and gun to strangers and being pushy about his government status. The statement did not specify any dates for the incidents. On another occasion she asserted that Henley got drunk at a club in York, no date specified, and that she learned of the incident from an unnamed friend. She also specified the time, date and name of a female friend (Dorothy Coberly) who called her to complain that Henley was with her (see, Item (h) *infra*).

    (e)  A typed report submitted, without any signatures whatever, stating that one Myrtle Arnold saw the plaintiff at a baseball game at a time and place which conflicted with the plaintiff's work records. The typed statement apparently was orally given to Inspector Peterson by Mrs. Arnold. The two-paragraph report contains the assertion that Mrs. Arnold knew Henley. It also contains the observation that she "refused to elaborate further" and declined to appear. The report does not explain the absence of a signed statement from Mrs. Arnold. The "statement" was intended to prove that Henley had falsified work timesheets which showed him elsewhere than the baseball game.

    (f)  A second unsworn, handwritten statement bearing the signature of Evelyn E. Walters, in a handwriting distinctly different from the text. In the second statement Miss Walters stated that "sometime in May 1971" a government car operated by Henley was towed away from a No Parking zone. She alleges that Henley had spent the night with her and during the following morning the car had been towed away. She alleged that at noon she drove Henley to the garage to retrieve the car. Henley's allegedly improper con-

---

7. The court is not including here a synopsis of evidence relating to charges which were dismissed on administrative appeal and are consequently irrelevant to the instant case.

8. The statement also carried a sworn and subscribed line signed by Inspector Peterson.

Inspector Peterson was authorized to administer oaths. 26 U.S.C.A. § 7622, Internal Revenue Service delegation order No. 37.

9. This statement was sworn to under the circumstances as above described.

duct was not the parking violation or his visit to Miss Walter's home, but rather using a government vehicle to go to and from a personal, nongovernmental meeting.

(g)  An unsigned, typewritten report apparently prepared by Inspector Peterson which quotes Jerry Meals as saying that he assisted in towing a government vehicle from the above-noted location and that later a man picked up the car. Meals could not recall the man's name but he did identify himself as a federal agent. The agent was in the company of a blonde lady in a yellow Cadillac. (Henley at no time denied that his car was towed from a No Parking zone). The report does not explain the absence of a signature by Meals. His statement was apparently intended to corroborate Miss Walter's version of the auto towing incident.

(h)  An unsworn, handwritten statement with an apparent signature of Dorothy Coberly, in a distinctly different handwriting than the text. Her statement confirmed that she had indeed called Miss Walters to say that Henley was with her at a bar. The time Mrs. Coberly claimed to have been with Henley was in direct conflict with a work timesheet which showed him to have been conducting an investigation.

(i)  An unsworn, handwritten statement apparently signed by one Marlin C. Smith, the Proprietor of a gun shop, that he was not contacted by Henley on the date which Henley claimed he had interviewed Smith. A similar unsworn statement was signed by Robert T. Burnett. Burnett's statement could not pinpoint when he was contacted by an IRS agent, nor the agent's name.

Of the preceding statements only those of Spong and Hurley were sworn to. No explanation appears in the record for the lack of an oath on the other statements except for that of Mrs. Arnold who apparently refused even to sign.

The balance of the statements, mostly unsworn, were submitted on behalf of Henley. However, each one of the persons who made a statement on the plaintiff's behalf also testified under oath, in person, at Henley's hearing before the examiner.

The agency's inability to compel a necessary witness's attendance and testimony regarding a material allegation is not a license to rely on secondary and insubstantial evidence. In other words, the lack of subpoena power cannot be read as lowering the standard of proof imposed on an administrative proceeding. If an agency cannot establish the case against the accused due to lack of subpoena power, then its case must fall.

We are well aware that the rules of evidence applicable in a court are more stringent than those of an administrative agency. There exists a dispute, for example, as to the admissiblity of certain forms of hearsay ( 6 A.L.R. Fed. 76). In Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Court resolved that hearsay is not only admissible, but it can, under limited conditions, be considered substantial evidence in an administrative action.

Perales was a social security benefits case in which the plaintiff had been denied disability benefits, based in part on sworn affidavits of examining physicians. The Court took the occasion to conclude that the mere fact of being hearsay did not bar its admissibility, nor prevent the contents from being relied upon by the examiner. The Court was mindful of the admonition by Chief Justice Hughes that "mere uncorroborated hearsay or rumor does not constitute

substantial evidence." Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 230, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938). The Perales Court, speaking through Justice Blackmun, noted that Consolidated Edison was not decrying hearsay because of its inadmissibility in a formal trial, but rather hearsay "without a basis in evidence having rational probative force."

The Court proceeded to set down guidelines which gave the hearsay there probative force, essentially relying upon the following facts: (1) the physicians had no conceivable bias or interest in the outcome; (2) the reports were available for scrutiny prior to the hearing; (3) the claimant had the option to subpoena the physicians who prepared the reports; (4) there existed no "specter of questionable veracity" regarding the physicians; (5) no apparent inconsistencies existed on the face of the reports, and (6) the case involved a denial of proposed benefits, not the withdrawal of existing ones. Based on the preceding the Court in Perales concluded that hearsay can be considered "substantial" evidence.

This court does not view Perales as disposing of the test of "rational probative force" enunciated in Consolidated Edison. See, e. g., Note 85 Harv.L.Rev. 326, 328 (November, 1971).

The instant case presents a wholly different situation. Most obvious is the existence of subpoena power in the social security machinery which would have allowed Perales to compel the presence of the physicians in question. Such a distinction is clearly significant. Cf. Clutchette v. Procunier, 328 F.Supp. 767, 783 n.15 (N.D.Cal.1971). Secondly, the entirety of the evidence presented against the instant plaintiff is non-expert testimony where the credibility of the witness is crucial. Blackwell College of Business v. Attorney General, 147 U.

S.App.D.C. 85, 454 F.2d 928, 933 (1971). Here, the "specter of questionable veracity" is clearly present with most of the persons who submitted statements.[10] Likewise, there exist instances of internal inconsistencies or important unanswered questions affecting credibility and veracity. Lastly, here, as in Goldberg v. Kelly, 397 U.S. 254, 90 S. Ct. 1011, 25 L.Ed.2d 287 (1970), the case involves withdrawal of a benefit contrasted with refusal to provide a benefit. The only element in Perales which was satisfied in the instant case was the availability of the statements in advance of the hearing.

The evidence presented at the hearing is, in this court's opinion, precisely the sort without "rational probative force" criticized by Chief Justice Hughes in Consolidated Edison. Not only is the primary evidence largely unsworn hearsay, but it can depend on none of the factors which ordinarily redeem hearsay. The testimony was what Judge Skelton called "hearsay on top of hearsay." Peters v. United States, 408 F. 2d 719, 187 Ct.Cl. 63 (dissenting) (1969).

As the majority in Peters noted:

"The probative value of hearsay rests in part upon the credibility of the witness testifying as to the hearsay statement, the accuracy of his recollection or statement of the alleged hearsay, and his ability and opportunity to observe and hear what was said of the hearsay . . . ." Id., at 724.

The instant case fails even here. Inspector Bond was not the person who took the damaging statements. He could not testify to any of the circumstances surrounding the actual taking of the statements (e. g. the possibility of coaching; possible hostility expressed by the witness; the speed of recollection demonstrated by the witness, etc.).

10. The court has examined every case published to date which cites Perales. The vast majority involve social security cases factually on point. To date no court has held that Perales sanctions a finding of substantiality based on evidence of the type presented against the instant plaintiff.

In short, the already undesirable nature of hearsay was compounded by the inability of the witness to verify anything about credibility. Inspector Bond testified that he was present when Miss Walters and Mr. Spong were subsequently asked whether they had actually given statements. However, as to all the remaining witnesses there exists nothing whatever with regard to their statements. For example, the hearing examiner relied on the statement of Mrs. Arnold to find that Henley had falsified work reports. Only Inspector Peterson ever met Mrs. Arnold, and he did not testify. Further, her "statement" was typewritten and unsigned in addition to exhibiting the usual drawbacks of hearsay. Mrs. Arnold allegedly "knew" Henley. The nature of their relationship, her ability to actually identify Henley, etc., all cast considerable question on her testimony. Likewise, her "statement" is completely lacking in a key area. Nowhere does it indicate if she merely observed Henley early in the day and then again later, or whether they were together throughout the day.

Miss Walter's potential bias virtually leaps out and requires examination, as does her unexplained failure to "remember" for several months Henley's allegedly improper use of a government vehicle. Miss Walters was Henley's admitted paramour. Moreover, at her own instigation she wrote a letter to Agent Hankins complaining that the plaintiff was "bothering" her. This clear attempt to reveal her relationship to Henley's superiors and her request that they control Henley raise crucial questions about her motives in the entire matter.

To merely accept her damaging, unsworn testimony at face value falls well short of the quality of evidence needed to get to a jury. Columbian Enameling, *supra*, 306 U.S. at 299–300, 59 S.Ct. 501.

Mr. Spong, whose assertion that the plaintiff was abusive in public was contradicted in part by a live witness under oath, a fellow member of his police force.[11] The court finds these, the most incriminating against Henley, to be like the witness described in Reil v. United States, 456 F.2d 777, 781, 197 Ct.Cl. 542 (1972):

> "He was at the farthest removed from the disinterested doctors of *Richardson* v. *Perales*. He was just the sort of witness for whom the art of cross-examination was invented, and whose statements could inspire confidence only if they endure that test . . . . ."

We are fully cognizant that the credibility of witnesses is within the peculiar domain of the hearing examiner. Carr v. United States, 337 F.Supp. 1172, 1177 (N.D.Cal.1972). Here, however, there was virtually no credibility to judge. Only minor points were raised in support of one or two deponent's statements, and it, too, was unsworn. Where, as here, an agency relies on the printed word for testing credibility, then an appellate court is equally within its bounds to do the same. N. L. R. B. v. National Die Casting Co., 207 F.2d 344 (7th Cir. 1953). This court has no doubt about the integrity of Inspectors Bond and Hankins, but their testimony was almost totally irrelevant. Whatever weight the hearing examiner gave their

11. As an example of a contradiction which required clarification, was Spong's allegation that Henley was intoxicated. However, no ticket was issued and in fact Henley was allowed to drive home. Bond later testified that Spong described the gesture as a "professional courtesy," a curious remark in light of Spong's allegation that Henley's conduct was abusive and unprofessional. The other officer was at a convention and did not testify. Moreover, Officer Hurley was not present at Spong's initial arrest of Henley. No witness appeared to in any way verify the second officer's hearsay. Patrolman James McNaughton III, who contradicted Spong's characterization of Henley's condition and attitude, was present at least enough of the time to warrant close scrutiny of Spong's version of the initial arrest. Finally, it appears from an unsworn statement from the Marysville, Pennsylvania, Police Chief that Spong had been dismissed from his force as unsuitable. This area also demanded examination.

testimony remains undisturbed by this court.

There is at least implied support for this position found in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed. 2d 15 (1974), the plurality limited itself to the timing of a removal hearing, not its procedures. However, Justice Powell's concurring opinion, in which Justice Blackmun joined, anticipated that the employee would get the sort of protection called for in Goldberg v. Kelly when he wrote:

> "Having determined that the constitutional guarantee of procedural due process applies to appellee's discharge from public employment, the question arises whether an evidentiary hearing, including the right to present favorable witnesses and to confront and examine adverse witnesses, must be accorded *before* removal. . . ." 416 U.S., at 167, 94 S.Ct., at 1651, 40 L.Ed. 2d, at 41 (Emphasis in original)

Likewise, Justice White, concurring, made clear that:

> "The employee may appeal from an adverse decision [by the agency] and is entitled to an evidentiary trial-type hearing at this stage. This later hearing affords the employee certain rights not available within OEO at the pretermination stage, *particularly the taking of testimony under oath and the cross-examination of witnesses.*" Id., at 173–175, 94 S.Ct., at 1654, 40 L.Ed.2d, at 44–45 (Emphasis added)

The nature of the dissents in Kennedy and the fact that the instant plaintiff proceeded under an identical statutory and regulatory scheme of appeal combine for an inescapable result. It seems clear that the Supreme Court anticipated a hearing more in line with the right of procedural due process than that afforded Henley.

This court finds Consolidated Edison, Perales, Kelly and Kennedy to be consistent, clear and demanding in their call for final dismissal based only on substantial evidence and procedural due process.

We conclude that the sort of evidence presented against the plaintiff was, as a matter of law, devoid of substantiality. Assuming, *arguendo*, its admissibility and relevance, it nevertheless fails to establish a substantial case. The evidence in the instant case is the sort described in Arkansas Grain Corp., supra, as creating "a mere suspicion" of guilt.

Today's decision recalls the court's words in Reil where it granted the plaintiff's cross-motion for summary judgment:

> "In so holding we are not establishing a rule that unduly impedes the operation of fact-finding tribunals lacking subpoena power . . . because the deficiency results in part from failure to employ investigative techniques readily available to such agencies." Reil, *supra*, 456 F.2d at 781.

An appropriate order will be entered.

## APPENDIX

### REASON I

#### *Unnecessary Exposure of Firearms in Public*

Section 1942.67 of the Rules of Conduct for IRS employees reads as follows: "Employees authorized to carry firearms are forbidden to unnecessarily expose or display such firearms in public."

#### SPECIFICATION I

In March or April 1971, at approximately 2:30 a. m. or 3:00 a. m., you left the Republican Club, Second Street, Harrisburg, Pa. You became involved in a dispute with people on the sidewalk near the Republican Club; you drew your gun; told an individual that you were a Federal Officer, and continued pointing the gun at people fleeing down the street from the Club.

#### SPECIFICATION 2

During November or December 1970, while at the Billy Bud Inn, Arsenal Road, York, Pa. you took your gun out and showed it to an individual sitting at the bar. Your display of the gun

was observed by Susan Nicholas, a barmaid, and patrons at the bar.

## REASON 2

### *Negligence in Driving Government-Owned Vehicle*

Section 1942.64(3) of the Rules of Conduct for IRS employees states: "The Federal Tort Claims Act provides, in part, that individuals may file suits against the Government for personal injury or death caused by negligence, or a wrongful act or omission of a Government employee acting within the scope of his employment. The Government must not be exposed needlessly to this potential liability in the event of personal injury of someone whose presence in the Government-owned vehicle (or leased vehicle) is not essential."

### SPECIFICATION I

On January 17, 1972, at approximately 11:10 p. m. while you were driving a Government-owned Matador car, you drove thru a red traffic light at Front and Walnut Streets in the Borough of Wormleysburg, Pa. You had a passenger in the car known to you as "Len."

### SPECIFICATION 2

On January 17, 1972, at approximately 11:10 p. m. you were under the influence of alcohol (while driving a Government-owned Matador car) at Front and Walnut Streets, Wormleysburg, Pa. You had a passenger in the car known to you as "Len".

### SPECIFICATION 3

On October 12, 1971, at approximately 5:25 p. m., you drove a Government Owned Rebel car from the Carriage House Bar and Restaurant, Camp Hill, Pa. to the Penn Harris, Motel, Harrisburg, Pa., after you had drunk (5) bottles of beer between approximately 3:25 p. m. thru 5:25 p. m. You had a passenger in the car, Special Investigator William F. Alfree.

## REASON 3

### *Attempting to Cause Unwarranted Arrest of Local Law Enforcement People*

Section 1941.4(1) of the Rules of Conduct for IRS employees states: "The effectiveness of the Revenue Service in serving the public interest depends upon the extent to which the Service and its employees hold the confidence and esteem of the Nation's citizens. This means that each employee must do his part to maintain this confidence and esteem by performing his work conscientiously, courteously, and in the most effective manner possible, by conducting himself during and outside working hours in a manner which will bring credit upon the Service; and by observing the spirit, as well as the letter, of the laws and regulations, and revenue Service and Treasury Department requirements governing employee conduct. Employees whose conduct does not conform to the rules may be removed from the Service or may be the subject of other disciplinary action."

### SPECIFICATION I

On January 17, 1972, at approximately 11:10 p. m., at the Walnut Street Bridge, at Miscia's American Gas Station, Borough of Wormleysburg, Pa., while driving a Government-Owned 1972 Matador car, you were stopped by Wormleysburg Patrolman Steven L. Spong for driving thru a red traffic light at Walnut and Front Streets, Borough of Wormleysburg.

While patrolman Spong was writing down information pertaining to your driver's license and car registration, you told him that you were placing him under arrest, and showed him your Treasury Department Alcohol & Tobacco Badge. You told him to park his police vehicle, and that you were taking him to York to put him in jail overnight. When Patrolman Spong told you that if you continued swearing he would arrest you, you told Pa-

trolman Spong that he could not arrest you because you were a Federal Officer.

## SPECIFICATION 2

On January 17, 1972, at approximately 11:30 p. m., at the Walnut Street Bridge, at Miscia's American Gas Station, Borough of Wormleysburg, Pa., while driving a Government-Owned 1972 Matador car, you were stopped by Wormleysburg Patrolman Spong for driving thru a red traffic light at Walnut and Front Streets. Chief Police Hurley of Wormleysburg Police Department, who was called to Walnut Street Bridge area, after you insisted upon stating to Patrolman Spong that you were arresting him, asked you to present the driver's license which you had initially presented to Patrolman Spong (in the name of James M. Bowman). Chief of Police Hurley showed you his Police Badge.

While Chief Hurley was in his car writing information concerning the registration and licenses, you walked to his car and told him that he and his officer were under arrest. You became loud and boisterous; stating again you were going to arrest them and take them to York, and that you were going to have your boys come over. You identified yourself to Chief Hurley who told you that he had been a policeman for longer than twelve years and never came across a man who works in the Government who conducted himself as you had in the general public.

## REASON 4

### Use of Intoxicants

Section 1942.33 of the Rules of Conduct for IRS employees states: "Employees may not use intoxicants habitually to excess, or in a manner adversely affecting their work performance. Intoxicants may not be consumed while on official duty unless required in order to maintain security on an undercover assign-

ment. To the extent that the use of intoxicants discredits either the employee or the Service, such use is also forbidden. The Revenue Service will hold employees responsible for any conduct or embarrassment stemming from the employee's use of intoxicants."

## SPECIFICATION I

On January 17, 1972, you were under the influence of alcohol while on official duty, at approximately 11:10 p. m. in Wormleysburg, Pa., you were driving a Government-owned 1972 Matador car. You caused embarrassment to the Service by attempting to cause the unwarranted arrest of Patrolman Steven L. Spong and Chief of Police John R. Hurley, identifying yourself as a Treasury Department, ATF officer.

## SPECIFICATION 2

During March or April 1971, you were under the influence of alcohol while at the Republican Club, Second Street, Harrisburg, Pa., where you were known as a Federal officer. You later left the Club and you embarrassed the Service by drawing your gun while under the influence of alcohol when you became involved in a dispute with people on the sidewalk near the Republican Club, identifying yourself as a Federal Officer and pointed your gun at people that were fleeing down the street.

## REASON 5

### Unauthorized Use of Government-Owned Vehicle

Section 1942.64 of the Rules of Conduct for IRS employees states: "(1) Public Law 600, 79th Congress, provides in part that any officer or employee of the Government who willfully uses or authorizes the use of any Government owned or leased passenger motor vehicle for other than official purposes shall be suspended from duty by the head of the department concerned, without compensation, for not less than one month, and shall be suspended for a longer period,

or summarily removed from office, if circumstances warrant.

(2) Employees of the Revenue Service also may not transport any person in a Government owned or leased motor vehicle unless that person's presence is deemed essential to the successful completion of an official mission. Persons not deemed essential to the completion of an official mission can include other Service employees or family members.

### SPECIFICATION I

During the Summer 1971, you followed Evelyn E. Walters to her home, 2007 N. 3rd Street, Harrisburg, Pa., and forced her, by verbal threat, to enter the Government owned car you were driving and you transported her in such car to the Republican Club in Harrisburg, Pa., on other than official business.

### SPECIFICATION 2

On May 3, 1971, you drove the 1970 green Rebel Government owned car, registration no. 926–529, assigned to you for official business, to visit and stay overnight at the home of Evelyn E. Walters, 2007 N. 3rd Street, Harrisburg, Pa. You stayed overnight at Evelyn E. Walter's home and remained there until approximately noon the next day. The aforementioned Government owned car which you parked on the 2000 block of 3rd Street, near Evelyn E. Walters' home, was parked in a No Parking Zone, and on May 4, 1971, City of Harrisburg, Pa. towed the aforementioned Government car to the Meals Service Center.

### REASON 6

*Falsification of Official Documents*

Section 1942.55 of the Rules of Conduct for IRS employees states: "Proper functioning of the Revenue Service requires that the Service, the courts, other Federal agencies and the public be able to rely implicitly on the truthfulness of Revenue Service employees in matters of official interest. An employee may be subjected to severe disciplinary action and prosecution for intentionally making false or misleading verbal or written statements in matters of official interest. Some of these matters of official interest are: transactions with taxpayers, other Federal agencies or fellow employees; entries on tax returns, work reports of any nature or accounts of any kind; vouchers, leave requests, applications forms SF–57, and other forms which serve as a basis for appointment, reassignment, promotion, or other personnel actions; and affidavits, transcripts of testimony, or statements to inspection, whether or not under oath."

### SPECIFICATION I

Form 1494, Daily Report of Special Investigator, executed by you, indicated that on May 4, 1971, between the hours of 8:30 a. m. to 12:30 (4 Hours) you were on official duty— "Meeting with an informant at his request; conferring and conducting investigation relative suspected T–11 violation. SII, to be requested if necessary Sep. from info. re. LI–HBG. 71–24(T–11);" whereas you actually were in the home of Evelyn E. Walters, 2007 N. 3rd Street, Harrisburg, Pa., during the hours of 8:30 a. m. thru approximately 12:00 noon, having spent the night in her home. You left her home approximately at noon on May 4, 1971 to recover the Government owned car at Meals Service Center which the City of Harrisburg, Pa. had towed away on May 4, 1971 because it was parked in a No Parking Zone.

### SPECIFICATION 2

Form 1494, Daily Report of Special Investigator, executed by you showing your activity for the period September 21, 1971 thru September 24, 1971, indicated you were on sick leave on September 21, 1971; whereas you spent the day of September 21, 1971 with Evelyn E. Walters, 2007 N. 3rd Street, Harrisburg, Pa., and in the evening she and you went to the 210 Club.

## SPECIFICATION 3

Form 1494, Daily Report of Special Investigator, executed by you covering your official activity for October 6, 1971, indicates that from 12:30 p. m. to 2:30 p. m. you were enroute to Mt. Union, Pa., and from 2:30 p. m. to 4:00 p. m. you went to Western Auto to discuss official business; whereas you actually were at the Carriage House, Carlisle Pike, Camp Hill, Pa., from approximately 1:30 p. m. watching the baseball game between the Pittsburgh Pirates and the San Francisco Giants, and remained there until late afternoon.

## SPECIFICATION 4

Form 1494, Daily Report of Special Investigator, executed by you covering your activity for October 6, 1971, indicated that from 6:00 p. m. to 7:30 p. m. you were enroute to Halifax, Pa.; whereas you were at the Fountain House, E. Trindle Road, Mechanicsburg, Pa. during the stated time.

## SPECIFICATION 5

Form 4317, Report of Firearms Licence Compliance Investigation, executed by you on October 6, 1971, indicated you conducted an investigation of Smitty's Guns and Ammunition at 424 Market Street, Halifax, Pa.; whereas you did not conduct such an investigation on October 6, 1971.

## SPECIFICATION 6

Form 4136. Report of Firearms Application Investigation, executed by you on October 6, 1971, indicates you conducted a four hour investigation of Robert T. Burnest, t/a Western Auto Associate Store, Mt. Union, Pa.; whereas you did not conduct a four hour investigation at the aforementioned business and its premises on October 6, 1971.

## REASON 7

*False Statements to Internal Revenue Service Officials*

Section 1942.55 of the Rules of Conduct for IRS employees states: "Proper functioning of the Revenue Service requires that the Service, the courts, other Federal agencies and the public be able to rely implicitly on the truthfulness of Revenue Service employees in matters of official interest. An employee may be subjected to severe disciplinary action and prosecution for intentionally making false or misleading verbal or written statements in matters of official interest. Some of these matters of official interest are: transactions with taxpayers, other Federal agencies or fellow employees; entries on tax returns, work reports of any nature or accounts of anykind; vouchers, leave requests, application forms SF-57, and other forms which serve as a basis for appointment, reassignment, promotion, or other personnel actions; and affidavits, transcripts of testimony, or statements to inspection, whether or not under oath."

## SPECIFICATION 1

In an affidavit given by you on November 16, 1971 at the Office of the Regional Inspector, Philadelphia, Pa., you denied you were anywhere else on October 6, 1971, other than the places listed on your "Daily Report" for that date and during the time listed therein. However, on October 6, 1971, at approximately 1:30 p. m., you arrived at the Carriage House Bar, Carlisle Pike, Camp Hill, Pa., and watched the baseball game between the Pittsburgh Pirates and the San Francisco Giants and remained there until late afternoon; although Form 1494 Daily Report of Special Investigator, which you executed indicates that on October 6, 1971 from 12:30 p. m. to 2:30 p. m. you were enroute to Mt. Union, Pa. and from 2:30 p. m. to 4:00 p. m. you visited Western Auto.

## SPECIFICATION 2

In an affidavit given by you on November 16, 1971 at the Office of the Regional Inspector, Philadelphia, You denied you were at Evelyn E. Walters' residence during the periods that your Daily Reports of Special Investigator reflect you were at a dif-

ferent location. However, on Form 1494, Daily Report of Special Investigator, executed by you covering your activity for May 4, 1971, you indicated that between the hours of 8:30 a. m. and 12:30 p. m. you were "Meeting an informant at his request, conferring and conducting investigation relative to suspected T–11 violation; whereas you actually were in the home of Evelyn E. Walters, 2007 N. 3rd Street, Harrisburg, Pa., during the hours of 8:30 a. m. thru approximately 12 noon.

## SPECIFICATION 3

In an affidavit given by you on November 16, 1971 at the Office of the Regional Inspector, Philadelphia, Pa., you stated you completed Form 4317, Report of Firearms License Compliance Investigation, for Smitty's Guns and Ammunition, 424 Market St., Halifax, Pa., after personal contact with the persons listed thereon. On the aforementioned Form 4317, executed by you on October 6, 1971, you indicated you interviewed "E. Smith, Partner," whereas you did not contact him, nor his partner Marlen C. Smith.

## SPECIFICATION 4

In an affidavit given by you on November 16, 1971 at the Office of the Regional Inspector, Philadelphia, Pa., you stated you completed Forms 4316, Report of Firearms Application Investigation, for Robert W. Burnett, t/a Western Auto, 101 W. Shirley St., Mt. Union, Pa., after personal contact with the persons listed thereon. On the aforementioned Form 4316, executed by you on October 6, 1971, you indicated you interviewed "R. Burnett, Owner," whereas you did not interview him.

## SPECIFICATION 5

In an affidavit given by you on November 16, 1971 at the Office of the Regional Inspector, Philadelphia, Pa., you stated you never transported anyone, male or female, in a Federally owned vehicle except on official business; whereas during the Summer 1971, you forced, by verbal threat, Evelyn F. Walters, 2007 N. 3rd Street, Harrisburg, Pa. to enter the Government owned car and transported her to the Republican Club in Harrisburg, Pa. on other than official business.

## SPECIFICATION 6

In an affidavit given by you on November 16, 1971 at the Office of the Regional Inspector, Philadelphia, Pa., you stated you do not ever drive a Government vehicle for your own convenience; whereas on May 3, 1971, you drove a government owned Rebel car to the home of Evelyn E. Walters, 2007 N. 3rd Street, Harrisburg, Pa., to visit her and stay overnight at her house.

## SPECIFICATION 7

In an affidavit given by you on November 16, 1971 at the Office of the Regional Inspector, Philadelphia, Pa., you stated you never exhibited your gun to anyone at anytime except in the line of duty; whereas in March or April 1971, while not on official duty, you were involved in a dispute with people on the sidewalk near the Republican Club, Second St., Harrisburg, Pa. You stated you were a Federal officer and continued pointing the gun at people fleeing down the street from the Club.

## SPECIFICATION 8

In an affidavit given by you on November 16, 1971 at the Office of the Regional Inspector, Philadelphia, Pa., you stated you never exhibited your gun to anyone at anytime except in the line of duty; whereas during November or December 1970, while at the Billy Bud Inn, Arsenal Rd., York Pa., you drew your gun and showed it to. an individual sitting at the bar. Your display of the gun was observed by Susan Nicholas, a barmaid, and patrons of the bar.

## SPECIFICATION 9

In an affidavit given by you on November 16, 1971 at the Office of the

Regional Inspector, Philadelphia, Pa., you denied taking any sick leave at anytime when you were not sick; whereas on September 21, 1971, you reported on Sick Leave, although you spent that day with Evelyn E. Walters, 2007 N. 3rd St., Harrisburg, Pa., and in the evening she and you went to the 210 Club.